KARL E. TURNER AND WIFE, BARBARA W. TURNER, ADMINISTRATORS OF THE ESTATE OF KERRY EDWARD TURNER, PLAINTIFFS v. THE CITY OF GREENVILLE, DEFENDANT

No. COA08-630

(Filed 16 June 2009)

**Police Officers— shooting after car chase—claim against city— public officer's immunity—summary judgment**

The trial court did not err by granting summary judgment for the City of Greenville on claims arising from the shooting death of plaintiffs' son by police officers after a car chase. The officers who were involved knew that the decedent was behaving unlawfully and in a manner that posed a danger to himself, officers, and other people, and the officers acted reasonably by pursing and attempting to apprehend decedent. The officers would be entitled to public officer's immunity, and a claim against the city cannot be supported. N.C.G.S. § 15A-401(d)(2).

Appeal by plaintiffs from judgment entered 19 March 2008 by Judge W. Russell Duke, Jr. in Superior Court, Pitt County. Heard in the Court of Appeals 10 February 2009.

*Robert D. Rouse, III, for plaintiffs.*

*Troutman Sanders LLP, by Gary S. Parsons and D. Kyle Deak, and Assistant City Attorney William J. Little, III, for defendant.*

WYNN, Judge.

Under N.C. Gen. Stat. § 15A-401(d), a law enforcement officer is justified in using deadly physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force.[1] In this appeal, Plaintiffs Karl and Barbara Turner argue that the trial court erred by granting summary judgment to Defendant City of Greenville on their claims arising from the shooting death of their son by police officers. Because the officers' actions were justified under N.C. Gen. Stat. § 15A-401(d) (2007), we affirm summary judgment in favor of the City of Greenville.

Early on the morning of 26 January 2006, Plaintiffs called the Greenville Police Department to request assistance with their belligerent son, Kerry Edward Turner, who suffered from a bipolar disorder. Plaintiffs indicated to the responding officers, Chad Bowen and Selestine Smith, that they wanted to have their son taken for a psychiatric evaluation. Kerry voluntarily left the house with the officers, who drove him to the hospital where they left him for evaluation.

At the hospital, Kerry was diagnosed with alcohol intoxication and upon his release a short time later, he called his parents who refused to bring him back to their home. Kerry responded by making threats to them and indicating that he was on his way to their house. Plaintiffs again called the Greenville Police Department and were advised to contact the Magistrate's Office to obtain an involuntary commitment order. After trying unsuccessfully to get an involuntary commitment order for their son, Plaintiffs went to the Greenville Police Department and, on returning to the Magistrate's Office with Officer Bowen, obtained an involuntary commitment order from the Magistrate.

---

1. N.C. Gen. Stat. § 15A-401(d)(2)a (2007).

Plaintiffs returned home and found Kerry waiting, appearing to be angry, and throwing objects at their car as they approached. Plaintiffs again called the Greenville Police Department. Officer Bowen responded and found Kerry visibly upset, screaming obscenities and throwing objects. Officer Bowen attempted to calm Kerry; however, he darted into the house and locked the door. Officer Bowen radioed the approaching officers that Kerry had barricaded himself inside the house.

Shortly after the second officer, Cachelle L. Warmell, arrived on the scene, Kerry emerged from the front of the house holding what appeared to be a shotgun, but was later identified as a broken and inoperable .22 rifle. Officers Warmell and Bowen took cover and, after a short time, Kerry went back into the house without shots being fired. Believing, however, that Kerry was armed and dangerous, the officers called for the Emergency Response Team, which responds to high risk situations.

Thereafter, Barbara Turner and Lieutenant Susan Bass attempted unsuccessfully in multiple phone conversations to coax Kerry out of the house. Lieutenant Bass testified in her deposition that Kerry made statements such as, "The pigs are gonna have to kill me."

While the Emergency Response Team positioned its personnel around the Turner home, Kerry suddenly exited from the side of the house and got into a red SUV parked in the driveway. Some officers testified that it appeared as though Kerry threw a long black object into the vehicle. Emergency Response Team personnel approached and ordered Kerry to stop, but he started the vehicle and backed it out of the driveway in the direction of the officers at a high rate of acceleration. The Emergency Response Team personnel jumped out of the way and took cover, with one of them firing a shot that punctured the rear left tire of the vehicle.

A pursuit followed that reached speeds of seventy to eighty miles per hour on city streets. Officers testified in their depositions that Kerry rammed or attempted to ram at least four police patrol cars, nearly collided with a school bus, veered over the center line multiple times, and nearly struck Officer Robert Jones as he attempted to lay spike strips.

Listening to reports of the chase on the radio, Sergeant David Johnson positioned his patrol car on Greenville Boulevard and prepared to lay his spike strips just as the red SUV turned onto

Greenville Boulevard and proceeded in his direction. Sergeant Johnson was out of his patrol car and in the roadway when he observed Kerry approaching and making an alleged attempt at "deliberately striking [his] vehicle . . . ." According to Sergeant Johnson, the red SUV "skidded past," swerved into lanes of oncoming traffic, and entered a 180 degree spin, going up onto two wheels.

Upon seeing this, Sergeant Johnson ran towards the red SUV, believing it would turn over and allow him to apprehend Kerry. But instead of turning over, the red SUV returned to all four wheels and wound up facing Sergeant Johnson as he stood in the open road. Thereafter, Kerry accelerated forward, making contact with a civilian's vehicle and pushing it backward some twenty-eight feet. Meanwhile, Officer Warmell's patrol car was just arriving on the scene as Kerry pushed and tried to swerve around the civilian vehicle. With its tires spinning and smoking, the red SUV became wedged between the civilian vehicle and Officer Warmell's patrol car, which "rocked back and forth."

At some point after the red SUV made contact with the civilian vehicle, Sergeant Johnson and Officer Keith Knox opened fire. Sergeant Johnson was positioned in the open roadway, somewhere near the front passenger-side of the red SUV. Officer Knox was in the rear seat on the driver's side of Officer Warmell's patrol car when he leaned out the window and opened fire. Multiple shots struck Kerry, causing his death.

Plaintiffs sued the City of Greenville alleging negligence, assault and battery, and willful and wanton conduct. Following a hearing, the trial court granted the City of Greenville's motion for summary judgment on the defenses of federal qualified immunity and public officer's immunity. Plaintiffs appeal arguing that the trial court improperly granted summary judgment in favor of the City of Greenville. We disagree.

Summary judgment is proper when there is no genuine issue as to any material fact and any party is entitled to judgment as a matter of law. N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). The nonmoving party is entitled to the most favorable view of the affidavits, pleadings and other materials and all reasonable inferences to be drawn therefrom. See Prior v. Pruett, 143 N.C. App. 612, 617, 550 S.E.2d 166, 170 (2001), disc. review denied, 355 N.C. 493, 563 S.E.2d 572 (2002).

The general rule in North Carolina is that a municipality is "immune from torts committed by an employee carrying out a govern-

mental function." *Schmidt v. Breeden,* 134 N.C. App. 248, 252, 517 S.E.2d 171, 174 (1999) (quoting *Hare v. Butler,* 99 N.C. App. 693, 698, 394 S.E.2d 231, 235, *disc. review denied,* 327 N.C. 634, 399 S.E.2d 121 (1990)). "Law enforcement operations" are "clearly governmental" activities for which a municipality is generally immune. *Id.* at 253, 517 S.E.2d at 175. A municipality may, however, waive its governmental immunity to the extent it has purchased liability insurance. N.C. Gen. Stat. § 160A-485(a) (2007) ("Any city is authorized to waive its immunity from civil liability in tort by the act of purchasing liability insurance. . . . Immunity shall be waived only to the extent that the city is indemnified by the insurance contract from tort liability.").

Similarly, "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." *Campbell v. Anderson,* 156 N.C. App. 371, 376, 576 S.E.2d 726, 730, *disc. review denied,* 357 N.C. 457, 585 S.E.2d 385 (2003).

> In this jurisdiction an official may be held liable when he acts maliciously or corruptly, when he acts beyond the scope of his duties, or when he fails to act at all. As long as a public official lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability.

*Bailey v. State,* 330 N.C. 227, 245, 412 S.E.2d 295, 306 (1991), *disavowed on other grounds,* 348 N.C. 130, 500 S.E.2d 54 (1998) (citations and quotation marks omitted). Accordingly, "[a]ctions that are malicious, corrupt, or outside of the scope of official duties will pierce the cloak of official immunity . . . ." *Moore v. Evans,* 124 N.C. App. 35, 42, 476 S.E.2d 415, 421 (1996) (citations omitted).

Moreover, the General Assembly has prescribed circumstances under which an officer's use of deadly physical force is justified. N.C. Gen. Stat. § 15A-401 states in relevant part:

> A law enforcement officer is justified in using deadly physical force upon another person . . . only when it is or appears to be reasonably necessary thereby . . . [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force . . . . Nothing in this subdivision constitutes justification for willful, malicious or criminally negligent conduct by any person which injures or endangers any per-

son or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force.

N.C. Gen. Stat. § 15A-401(d)(2) (2007). This portion of the statute "was designed solely to codify and clarify those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability." *State v. Irick*, 291 N.C. 480, 501, 231 S.E.2d 833, 846 (1977).

Preliminarily, we note that Plaintiffs sued only the City of Greenville. However, the allegations in Plaintiffs' complaint essentially seek to impute the individual officers' conduct to the City of Greenville under the respondeat superior doctrine.[2] We find several bases to affirm the trial court's grant of summary judgment for the City of Greenville.

First, the record on appeal shows that the officers' conduct was objectively reasonable, or justified, under section 15A-401(d)(2). Kerry's disregard for officers' commands, his driving recklessly through city streets, and his collisions with civilian and officers' vehicles could have caused the officers to reasonably believe they faced an imminent risk of deadly physical force. *See State v. Jones*, 353 N.C. 159, 164, 538 S.E.2d 917, 922 (2000) ("It is well settled in North Carolina that an automobile can be a deadly weapon if it is driven in a reckless or dangerous manner.").

The comment to section 15A-401 notes that a law enforcement officer "is permitted [to use deadly force] only in the defense situation or when necessary to prevent the risk of death or serious physical injury to others, made manifest by the use of a deadly weapon or other conduct or means . . . ." N.C. Gen. Stat. § 15A-401(d)(2) cmt.(d) (2007). Sergeant Johnson and Officer Knox were faced with that situation here because the red SUV—used as a deadly weapon under North Carolina law because Kerry drove it recklessly—was lodged between Officer Warmell's patrol car and a civilian vehicle. More-

---

2. The Complaint includes one bare allegation that could arguably support the City of Greenville's liability by direct negligence. The Complaint states: "The City of Greenville by and through its officers and supervisors have failed to adequately train the members of the Greenville Police Department . . . ." However, the Complaint alleges no specific acts or omissions that might constitute such a failure to adequately train, Plaintiffs' forecast of evidence before the trial court did not substantiate this allegation, the trial court's judgment does not address this theory of liability, and Plaintiffs have not argued this theory on appeal. Therefore, this theory of the City of Greenville's liability is not properly before us. *See* N.C. R. App. P. 10(b)(1) (2007); *Prior*, 143 N.C. App. at 621-22, 550 S.E.2d at 172-73 (forecast of evidence sufficient to sustain negligent training and supervision claim).

over, Sergeant Johnson and Officer Knox were aware that Kerry had led officers on a pursuit and exhibited threatening behavior before the pursuit began. Sergeant Johnson stood in the open road in a position of vulnerability while or immediately before the fatal shots were fired. Under these circumstances, we hold that Officer Knox and Sergeant Johnson could have reasonably believed that Kerry posed an imminent threat to themselves and nearby civilians, and that they were justified in using deadly physical force under section 15A-401(d)(2). This basis alone is sufficient to affirm the court's grant of summary judgment.

Nonetheless, we further note that the City of Greenville is immune from liability for the torts of any of its police officers' legitimate law enforcement activities unless it waived its governmental immunity by purchasing liability insurance. N.C. Gen. Stat. § 160A-485(a) (2007); *Schmidt*, 134 N.C. App. at 252, 517 S.E.2d at 174. Here, Plaintiffs alleged in their complaint that the City of Greenville had a liability insurance policy in effect on the date of the shooting, but the City of Greenville denied that allegation in its Answer and no affirmative proof of insurance coverage appears in the record.

Moreover, "[w]ithout a[n] underlying negligence charge against [the officers], a claim of negligence against the [municipality] can not be supported." *Prior*, 143 N.C. App. at 622, 550 S.E.2d at 172-73 (citing *Johnson v. Lamb*, 273 N.C. 701, 707, 161 S.E.2d 131, 137 (1968)). To remove the officers' "cloak of official immunity" in this case, Plaintiffs were required to show "[a]ctions that [were] malicious, corrupt, or outside of the scope of official duties . . . ." *Moore*, 124 N.C. App. at 42, 476 S.E.2d at 421.

The most favorable view of Plaintiffs' evidence showed: Officers Bowen and Smith were aware that Kerry suffered from a bipolar disorder when they escorted and left him at the hospital on the morning of 26 January 2006; Officer Bowen assisted Plaintiffs in obtaining an involuntary commitment order for Kerry from a magistrate; Officers Bowen and Warmell observed Kerry emerge from Plaintiffs' house holding what appeared to be a shotgun, forcing them to take cover; the Emergency Response Team was unable to prevent Kerry from leaving Plaintiffs' residence in the red SUV despite shooting out its left rear tire; a pursuit ensued during which the red SUV made contact with several police vehicles, one civilian vehicle, and nearly missed striking at least two officers; Sergeant Johnson stood in the open road somewhere to the front-passenger side of the red SUV on Greenville Boulevard; and Sergeant Johnson and Officer Knox

fatally shot Kerry at some point immediately before or while the red SUV was lodged between the civilian vehicle and Officer Warmell's patrol car.

Our review of Plaintiffs' forecast of evidence and the entire record does not reveal any action by any involved officer that was "malicious, corrupt, or outside of the scope of official duties." *Id.* Indeed, many of the involved officers either personally observed, or learned by communication, certain of Kerry's actions that were unlawful and personally threatening. Because the involved officers knew that Kerry was behaving unlawfully, and in a manner that posed danger to himself, the officers, and other persons, the officers acted reasonably by pursuing and attempting to apprehend him. *See Prior,* 143 N.C. App. at 620, 550 S.E.2d at 172 ("In a negligence action, a law enforcement officer is held to the standard of care that a reasonably prudent person would exercise in the discharge of official duties of like nature under like circumstances.") (citations omitted).

Nor do we find evidence that Sergeant Johnson or Officer Knox acted maliciously, corruptly, or outside the scope of their official duties when they fired the fatal shots. Plaintiffs produced no evidence that Sergeant Johnson and Officer Knox acted with any malice, ill will, or any motivation other than preserving the safety of the surrounding officers and civilians. Considering that Kerry had evaded law enforcement in a pursuit on city streets, and the red SUV was in a position that threatened the safety of officers (one of whom stood in the open road) and at least one civilian in an adjacent vehicle, we conclude that Sergeant Johnson and Officer Knox acted without malice or corruption within the scope of their official duties.

Accordingly, we hold that the officers involved in this case would be entitled to public officer's immunity based on Plaintiffs' forecast of evidence, which includes no proof of malicious, corrupt or ultra vires conduct by the officers. Because a negligence claim against the officers would not survive on Plaintiffs' forecast of evidence, "a claim of negligence against the [municipality] can not be supported." *Prior,* 143 N.C. App. at 622, 550 S.E.2d at 172-73.

In sum, we uphold the trial court's grant of summary judgment in favor of the City of Greenville.

Affirmed.

Judges STEPHENS and ERVIN concur.