NO. COA13-1164

NORTH CAROLINA COURT OF APPEALS

Filed: 17 June 2014

WILLIAM S. MILLS, Ancillary
Administrator of the Estate of
AARON LORENZO DORSEY, Deceased,
    Plaintiff-Appellant,

    v.                         Durham County
                                 No. 11 CVS 004886

DUKE UNIVERSITY, a Not for Profit
Corporation, LARRY CARTER, and
JEFFREY LIBERTO, Jointly and
Severally,
    Defendants-Appellees.

Appeal by Plaintiff from judgment entered 6 June 2013 by Judge Paul G. Gessner in Superior Court, Durham County. Heard in the Court of Appeals 17 March 2014.

    *Law Office of Michael R. Dezsi, PLLC, by Michael R. Dezsi, pro hac vice; and Tin Fulton Walker & Owen, PLLC, by Adam Stein, for Plaintiff-Appellant.*

    *Cranfill Sumner & Hartzog, LLP, by Dan M. Hartzog and Katie Weaver Hartzog, for Defendants-Appellees.*

McGEE, Judge.

Aaron Lorenzo Dorsey ("Mr. Dorsey") was shot and killed by a Duke University Police officer at approximately 1:00 a.m. on 13 March 2010, just outside the main entrance to Duke University Hospital in Durham ("the hospital"). When the shooting

occurred, Preston Locklear was being treated for a serious injury in the intensive care unit of the hospital. A number of members of Preston Locklear's family ("the Locklear family") were at the hospital that morning visiting him. The Locklear family members included: Charles Brayboy, Krecia Ann Brayboy, Alena Hull, Christine Locklear, Debbie Locklear, Justin Locklear, Shawn Locklear, Lenora Locklear, and Billie Jo Locklear.

In his deposition, Mondrez Pamplin ("Mr. Pamplin"), testified that he was a hospital security guard working in the front lobby of the hospital on the night shift between 12 and 13 March 2010. Shortly before 1:00 a.m. on 13 March 2010, a member of the Locklear family approached him to complain about a man panhandling near the entrance of the hospital. Mr. Pamplin went outside and saw Mr. Dorsey. He asked Mr. Dorsey if he was visiting someone in the hospital, and Mr. Dorsey replied that he was not. Mr. Pamplin then suggested to Mr. Dorsey that he leave Duke University property. Mr. Dorsey did not leave, so Mr. Pamplin contacted Duke University Police to report Mr. Dorsey as a suspicious person. Duke University Police officers Larry Carter ("Officer Carter") and Jeffrey Liberto ("Officer Liberto") (together, "the officers") responded, arriving at the

entrance of the hospital shortly after 1:00 a.m. Mr. Pamplin asked the officers to "check [Mr. Dorsey] out."

The officers approached Mr. Dorsey and asked for identification. Mr. Dorsey turned away from the officers and started walking away. At this point, according to the officers' testimony, Officer Liberto grabbed Mr. Dorsey and a struggle ensued. Officer Carter went to assist Officer Liberto, and Mr. Dorsey grabbed Officer Carter's holstered weapon and attempted to remove it from Officer Carter's holster. Officer Carter pressed down on Mr. Dorsey's hand or hands, attempting to prevent Mr. Dorsey from obtaining the weapon. Officer Carter was yelling: "He's got my gun. He's getting my gun." Officer Liberto let go of Mr. Dorsey and first began hitting Mr. Dorsey with his fists and then with his police baton. Officer Carter ended up struggling with Mr. Dorsey on the ground. Officer Liberto repeatedly asked if Mr. Dorsey had Officer Carter's gun, and both officers commanded Mr. Dorsey to let go of the weapon.

Some members of the Locklear family testified by deposition that they saw Mr. Dorsey grab Officer Carter's weapon and struggle with Officer Carter in an attempt to take that weapon. Other members of the Locklear family testified they could not see Mr. Dorsey's hands and, therefore, could not say if Mr. Dorsey was grabbing Officer Carter's weapon. However, they did

hear someone yelling things like: "He's grabbed the gun[,]" "[l]et go; let go; let go," and "let go of the gun." Some of the Locklear family deposition testimony differed from State Bureau of Investigation ("SBI") reports written after SBI agents had interviewed those family members immediately following the shooting. The officers were not able to subdue Mr. Dorsey and, at some point during the struggle, Officer Liberto drew his service weapon and shot Mr. Dorsey in the head at close range. Mr. Dorsey died at the scene.

This action was filed on 16 September 2011 by William S. Mills, administrator of Mr. Dorsey's estate ("Plaintiff"). Plaintiff's complaint named as defendants Duke University ("Duke"), Officer Carter, and Officer Liberto (together, "Defendants"). Plaintiff's complaint included as causes of action: (1) wrongful death/negligence, (2) wrongful death/assault and battery, and (3) wrongful death/willful and wanton conduct. Defendants filed a motion for summary judgment on 2 May 2013, alleging that the officers: (1) were "legally justified in using reasonable force to protect the lives and safety of themselves and other innocent bystanders[,]" (2) were "entitled to public official immunity[,]" (3) "acted reasonably at all times and there [was] no negligence or other grounds for liability which can be imputed to Duke[,]" (4) committed no acts

justifying punitive damages, and (5) that "[Mr.] Dorsey's actions at the time of the incident . . . were the sole proximate cause of his death and constitute contributory negligence[.]"

The trial court entered judgment on 6 June 2013 granting summary judgment in favor of Defendants on all claims, and dismissing the action with prejudice. Plaintiff appeals. There are additional relevant facts that will be discussed in the body of the opinion.

I.

Plaintiff argues that the trial court erred in granting summary judgment in favor of Defendants. We disagree.

We first note that all Plaintiff's arguments on appeal concern Officers Carter and Liberto in their individual capacities, and that Plaintiff does not argue that summary judgment, with respect to Duke, was improper. Therefore, summary judgment in favor of Duke is affirmed. Likewise, to the extent, if any, that Plaintiff's complaint contained claims against Officers Carter and Liberto in their official capacities, summary judgment on those claims is affirmed.

Summary judgment is proper only "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 578-79, 573 S.E.2d 118, 123 (2002) (citation omitted).

> This Court has recognized that deciding what constitutes a bona fide issue of material fact is seldom an easy task. Nonetheless, we have instructed that "an issue is genuine if it is supported by substantial evidence," which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion. Further, we have said that "[a]n issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. If the movant successfully makes such a showing, the burden then shifts to the nonmovant to come forward with specific facts establishing the presence of a genuine factual dispute for trial. "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." "All inferences of fact must be drawn against the movant and in favor of the nonmovant."

*Id.* at 578-79, 573 S.E.2d at 123-24 (citations omitted).

## II.

We must first address whether Officers Carter and Liberto are protected by public official immunity. "'[P]ublic officials cannot be held individually liable for damages caused by mere

negligence in the performance of their governmental or discretionary duties.' Police officers are public officials." *Clayton v. Branson*, 153 N.C. App. 488, 492, 570 S.E.2d 253, 256 (2002) (citations omitted). "A public official can be held individually liable if it is prove[n] that his act, or failure to act, was corrupt or malicious, or that he acted outside of and beyond the scope of his duties." *Id*. (citation and quotation marks omitted).

Plaintiff contends that the officers cannot be covered by public official immunity because they were hired by, and were working for, a private institution – Duke University. We disagree.

"[A] policeman is an officer of the State." *State v. Hord*, 264 N.C. 149, 155, 141 S.E.2d 241, 245 (1965) (citations omitted). "It is not the method by which a policeman becomes a member of the police force of a municipality that determines his status but the nature and extent of his duties and responsibilities with which he is charged under the law." *Id*. "To constitute an office, as distinguished from employment, it is essential that the position must have been created by the constitution or statutes of the sovereignty, or that the sovereign power shall have delegated to an inferior body the right to create the position in question." *Id*. "An essential

difference between a public office and mere employment is the fact that the duties of the incumbent of an office shall involve the exercise of some portion of the sovereign power." *Id.*; *see also State v. Ferebee*, 177 N.C. App. 785, 788, 630 S.E.2d 460, 462 (2006) (citation omitted) ("Under . . . the Campus Police Act, campus police officers have the same statutory authority granted to municipal and county police officers to make arrests for both felonies and misdemeanors and to charge for infractions within their jurisdictions. As such, they qualify as 'public officers' pursuant to N.C. Gen. Stat. § 14-223.").

Our General Assembly granted certain private universities the power to create campus police agencies through the enactment of Chapter 74G, the Campus Police Act. N.C. Gen. Stat. §§ 74G-1 to 13 (2013). "As part of the Campus Police Program, the Attorney General is given the authority to certify a private, nonprofit institution of higher education . . . as a campus police agency and to commission an individual as a campus police officer." N.C.G.S. § 74G-2(a). "The principal State power conferred on campus police by this Chapter is the power of arrest[.]" N.C.G.S. § 74G-2(b)(6). "In exercising the power of arrest, these officers apply standards established by State and federal law only[.]" N.C.G.S. § 74G-2(b)(8). "Campus police officers, while in the performance of their duties of

employment, have the same powers as municipal and county police officers to make arrests for both felonies and misdemeanors and to charge for infractions" on campus and other property as allowed by the Campus Police Act. N.C.G.S. § 74G-6(b).

It is clear that campus police such as Officers Carter and Liberto, like municipal police officers, act pursuant to authority granted by our General Assembly, and that their duties involve "the exercise of some portion of the sovereign power." *Hord*, 264 N.C. at 155, 141 S.E.2d at 245. We hold that Officers Carter and Liberto are entitled to public official immunity for their acts in furtherance of their official duties so long as those acts were not corrupt, malicious, or outside of and beyond the scope of their duties. *Clayton*, 153 N.C. App. at 492, 570 S.E.2d at 256.

## III.

Plaintiff first contends there existed "genuine issues of material fact such that summary judgment was improper." All three of Plaintiff's claims were for wrongful death. Specifically, Plaintiff argues:

> A genuine issue of fact clearly exists here, where one witness is claiming that Mr. Dorsey had a hold of Officer Carter's gun throughout the entire duration of the struggle, which was said to last *more than three minutes*, and where several other witnesses, those who were in close proximity to the events, testified that Mr. Dorsey *did*

*not, at any time*, reach for or grab Officer Carter's gun. The contradictory nature of the testimony of these witnesses is simply too glaring.

Plaintiff contends in his brief that the deposition testimony of Mr. Pamplin, Duke security guard Mark Golby, and Christine Locklear support the above argument. However, none of these witnesses testified that: "[Mr.] Dorsey *did not, at any time*, reach for or grab Officer Carter's gun." None of these witnesses testified in any manner to even a suspicion that Mr. Dorsey never grabbed Officer Carter's gun. These witnesses testified that, from where they were located during the incident, they could not see Mr. Dorsey's hands or Officer Carter's weapon. Because they could not see what was happening with Officer Carter's weapon during the struggle, they could not honestly state that they ever saw Mr. Dorsey grab Officer Carter's weapon. They did, however, provide the following testimony.

Mr. Pamplin testified, *inter alia*, that during the several-minute struggle, he heard the officers yell "[s]top resisting[,]" heard Officer Carter say: "He has my gun[,]" saw Officer Carter and Mr. Dorsey struggling — both standing up and on the ground — and heard the officers repeatedly command Mr. Dorsey to: "Let go of the gun; let go of the gun." When Mr. Pamplin was asked if he had "any reason to doubt that Mr. Dorsey

was holding the gun," he answered: "No." When asked if he thought Mr. Dorsey did grab Officer Carter's weapon, he answered: "Yes." Mr. Pamplin's testimony was generally consistent with that of both Officer Carter and Officer Liberto. This testimony is directly contrary to the following statement made by Plaintiff in his brief: "[Mr.] Pamplin testified that . . . Officer Carter yelled to Officer Liberto that Mr. Dorsey had a hold of Officer Carter's weapon, *although [Mr.] Pamplin denied that Mr. Dorsey ever actually had a hold of Officer Carter's gun.* (Pamplin Dep., p. 45)." (Emphasis added). Nowhere on page forty-five — or anywhere else in Mr. Pamplin's deposition — does he testify that Mr. Dorsey never "had a hold" of Officer Carter's weapon.

In his deposition, Duke security guard Mark Golby ("Mr. Golby"), testified as follows:

> Q. Okay. You gave some testimony in which you said you never saw [Mr.] Dorsey's hands on the gun; you never saw those sorts of things. From [where] you were standing, you were not able to see [Officer] Carter's gun, were you?
>
> A No.
>
> Q. And you were not able to see [Mr.] Dorsey's hands or [Officer] Carter's hands at that time, were you?
>
> A. No, I couldn't see.
>
> Q. So when you're saying you never saw

this, what you're really saying is you couldn't see it?

A. Right.

Mr. Golby further testified that, during the struggle, Officer Carter said Mr. Dorsey had a hold of Officer Carter's weapon, that Officer Liberto told Mr. Dorsey several times to let go of the weapon, and that Officer Liberto finally told Mr. Dorsey that if he did not release the weapon, Officer Liberto would shoot him. Nowhere did Mr. Golby indicate that Mr. Dorsey did not reach for or grab Officer Carter's weapon. Mr. Golby's deposition testimony is generally consistent with that of both Officer Carter and Officer Liberto.

Christine Locklear testified she saw the officers talking to Mr. Dorsey, but did not hear what was said. She saw them begin to scuffle and saw Mr. Dorsey and Officer Carter fall to the ground. She then went inside the hospital, and was inside when the shot was fired. As she was about to enter the hospital, immediately before she heard the shot, she "heard somebody say 'he's got his hands on the [weapon.]'" At Christine Locklear's deposition, when asked, she agreed she did not "know whether or not Mr. Dorsey got his hand on the officer's weapon[,]" she "just didn't see that[,] . . . if when he fell, that was going on – if when he fell that Mr. Dorsey did reach for it, I did not see it. Honey, I got away from that."

Christine Locklear did not say it did not happen. Plaintiff's attorney asked her if, when Mr. Dorsey and the officers were struggling on the ground, she thought "that Mr. Dorsey presented a serious risk of harm to the police officers?" She answered:

> I did. . . . I thought he could have grabbed his gun. . . . I mean, it was like he got in a rage or something when they asked him. You know, or I assumed they asked him to leave the premises, and it was like he got in a rage and real angry, I mean, just because of the assumptions or whatever. He was real, real upset. He was really angry.

Christine Locklear testified that, immediately after the shooting, she heard people talking about what had just happened, and she heard people saying things like:

> Yeah, that he did grab the Law's gun and that's the reason and I heard that — I assumed that the white man did hit him with the baton to get him off the Law but no way — I mean, it was said that he was beat with the baton, and he would not let go of the officer's gun that he had; so after [the officer] beat [him] so long and he wouldn't let go, that's when, I reckon, they drew the gun. And it was said that, you know, they told him to let go and he wouldn't and so he shot him.

Christine Locklear stated she didn't specifically remember if any of her family members said they saw Mr. Dorsey grab the gun. Nowhere in the testimony of Mr. Pamplin, Mr. Golby, or Christine Locklear did either of them state that Mr. Dorsey did not grab

Officer Carter's weapon, or that they believed Mr. Dorsey never grabbed Officer Carter's weapon.

Multiple other witnesses testified by deposition that they did see Mr. Dorsey attempting to take Officer Carter's weapon from Officer Carter's holster. Alena Hull ("Ms. Hull") testified:

> A  And they went to fighting and stuff, and the black officer [Carter], he was down on the ground; but the white officer [Liberto], now, he had out his gun.
>
> . . . .
>
> A  And telling the boy [Mr. Dorsey] to give up – he kept telling the boy to give up because they were already fighting him and beating him and he never would give up, and the black Law and him, they went down to the ground; and he had his hand on the Law's pistol.
>
> Q  Okay.  Who did?
>
> A  The guy that was shot.
>
> . . . .
>
> Q  Okay.  When you saw that, did you think he [Mr. Dorsey] was trying to take [Officer Carter's] gun?
>
> A  Yes, sir because he was in a rage.
>
> . . . .
>
> A  My opinion, the black guy that was down on the ground and the one that was shot, the white officer had no other choice but to shoot him where he shot, being honest, because if he would have done anything else,

he would have shot the other officer.

. . . .

> A   He was hitting him in his back, his head,
> [with what looked like a "blackjack"] and he
> never would turn loose.

It is true that a report made by SBI Special Agent B.S. Fleming following an on-site interview with Ms. Hull shortly after the incident does not include the same detail.  According to Agent Fleming's report, Ms. Hull told him "she heard someone scream that someone had a gun[,]" saw two officers fighting with a man, and saw a white officer with his weapon drawn.  According to this report, Ms. Hull could not see what was happening with Officer Carter's weapon or Mr. Dorsey's hands.

Krecia Ann Brayboy ("Ms. Brayboy") testified that Mr. Dorsey grabbed the black officer's weapon with his right hand and she thought at that time the black officer "threw his hand on top of [Mr. Dorsey's] hand trying to keep [Mr. Dorsey] from pulling [the officer's weapon]; getting it out of [the holster]."  Ms. Brayboy testified,

> to me, if he would have fired anywhere else
> below the shoulders, the black officer would
> have gotten shot.  . . . .  Truthfully, to
> be honest, I'm sorry for what happened, but
> the officer really had no other choice
> because if this man would have gotten this
> weapon unhooked, it would have been chaos
> there.  There isn't any telling who all
> would have been killed[.]

Ms. Brayboy heard the white officer saying: "Let it go, let it go. Let it go, let it go." Further, according to Ms. Brayboy, Mr. Dorsey

> just would not let that weapon go. . . . . [t]hey could not get him to break that grip. . . . . All I know is Mr. Dorsey had a grip of that man's weapon and would not let go. They begged and begged and begged this man to let this weapon go and he wouldn't.

Ms. Brayboy admitted she had withheld most of this information from the SBI agent who interviewed her on the night of the incident; instead, stating that she had been inside at the time and had not seen anything.

Charles Brayboy ("Mr. Brayboy") testified that Mr. Dorsey grabbed Officer Carter's weapon and would not let it go.

> I don't know how in the world [Officer Carter] held onto that guy and held his hand. The cop was telling him to let it go, man; let it go. . . . . He begged him, man. He begged him to let it go, man. He tried his best. . . . He told him to let it go, man. He said let it go, man; let it go; let it go, man; let it go. He didn't want to do it, man. . . . . I was scared if he got that gun out, man, there wasn't any telling what he might have done.

Mr. Brayboy testified he had withheld information from the original investigating officer, but, after thinking about the situation, he realized had it been his child who had been shot, he would have wanted to know why it happened.

Debbie Locklear first told investigators she saw the officers struggling with Mr. Dorsey, and heard them yelling, "'put it down' and 'let it go' over and over again." She told investigators she did not see what was in Mr. Dorsey's hands. In her opinion, the officers "did what they had to do" because Mr. Dorsey "refused to surrender" and the officers were "in danger." In her deposition testimony, Debbie Locklear stated:

> [Mr. Dorsey] was very, very – he was on something. This black guy, his eye balls were that big. They tussled. They fought. They tussled. I mean, they had a black – some kind of thing. I mean, they were just trying to make him – you know. When he got his hand on that gun – his gun was in the holster. The black guy got his hand on that gun and would not let that gun go, and when I gave this statement, I was throwing up. I was so disgusted. I was scared, crying, and everything else, and when you get in a state of mind like that there and you know when your life is on the line, too, your mind goes blank.

Plaintiff agrees that Mr. Dorsey and Officer Carter became engaged in a struggle; that Officer Liberto hit Mr. Dorsey multiple times with his fist and his standard issue baton; that Mr. Dorsey and Officer Carter fell to the ground, still locked in a struggle; and that Officer Liberto finally drew his service weapon and shot Mr. Dorsey in the head. Both officers testified that Mr. Dorsey grabbed Officer Carter's weapon and would not let it go. They both testified that Officer Liberto attempted

to get Mr. Dorsey to release the weapon by hitting Mr. Dorsey with his fist. Officer Liberto testified when that did not work, he removed his baton and began hitting Mr. Dorsey with the baton, but that Mr. Dorsey still would not release Officer Carter's weapon. The officers testified that Officer Liberto repeatedly commanded Mr. Dorsey to let go of the weapon. According to both officers, after Officer Carter and Mr. Dorsey fell to the ground, Officer Carter called out that Mr. Dorsey was pulling on the weapon. Officer Carter testified that his weapon was pulled partially out of his holster. Officer Liberto testified that Officer Carter yelled that Mr. Dorsey was "getting [his] gun." Both officers testified they believed Mr. Dorsey was an immediate threat because he was pulling on the weapon, would not release it, and might have gained control of it.

Plaintiff's own expert, Francis Murphy ("Mr. Murphy"), testified he believed Mr. Dorsey grabbed Officer Carter's weapon, though he believed it happened after Officer Liberto had hit Mr. Dorsey with his fists and the baton. Mr. Murphy also testified he believed the reason Officer Liberto shot Mr. Dorsey "was because he was inadequately trained. He didn't know how to control the situation. He didn't know how to break the situation up." Mr. Murphy testified he didn't believe Officer

Liberto wanted to shoot Mr. Dorsey; his opinion was that the officers were trying to arrest Mr. Dorsey without legal justification and that, due to poor training, the officers used unnecessary force and Mr. Dorsey responded. When asked: "But once [attempts to subdue Mr. Dorsey] had failed and they got to this point where the deadly force appeared to be imminent to be used against them, that's why [Officer Liberto] shot [Mr. Dorsey]?" Mr. Murphy replied: "Sure."

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff provided no evidence tending to show that Mr. Dorsey did not attempt to gain control of Officer Carter's weapon. "At the summary judgment stage, plaintiffs cannot rely on the allegations of the complaint; rather, plaintiffs need to present specific facts to support their claim." *Haynes v. B & B Realty Grp., LLC*, 179 N.C. App. 104, 109, 633 S.E.2d 691, 694 (2006) (citation omitted).

Our Supreme Court has long held:

> It is axiomatic that every person has the right to resist an unlawful arrest. In such case the person attempting the arrest stands in the position of a wrongdoer and may be resisted by the use of force, as in self-defense. True the right of a person to use force in resisting an illegal arrest is not unlimited. He may use only such force as reasonably appears to be necessary to prevent the unlawful restraint of his liberty. And where excessive force is exerted, the person seeking to avoid arrest

may be convicted of assault, or even of homicide if death ensues[.]

In applying this rule of law, this Court has engaged in the following analytical framework:

> Since the initial arrest . . . [was] illegal, plaintiff was entitled to use a reasonable amount of force to resist. Under this analysis, if the amount of force used by plaintiff was unreasonable . . ., then the officers had probable cause to arrest him under G.S. § 14-33(b)(8) [the statute criminalizing an assault on a law enforcement or government officer].

> Moreover, the General Assembly has also provided that an individual "is not justified in using a deadly weapon or deadly force to resist an arrest by a law-enforcement officer using reasonable force," when the individual knows that it is a true law enforcement officer who is attempting to make the arrest. N.C. Gen. Stat. § 15A-401(f)(1) (2005).

*State v. Branch*, 194 N.C. App. 173, 177, 669 S.E.2d 18, 20-21 (2008) (citations omitted). This Court has applied the same analysis when reviewing detentions not amounting to arrest. *Id.* at 178, 669 S.E.2d at 21.

Assuming, *arguendo*, the officers had no legal basis to detain Mr. Dorsey, Mr. Dorsey was not justified to resort to deadly force in response to that detention. Once Mr. Dorsey grabbed Officer Carter's weapon, he exceeded any "force as reasonably appear[ed] to be necessary to prevent the unlawful

restraint of his liberty." *Id*. at 177, 669 S.E.2d at 20. Mr. Dorsey's response was excessive, and became unlawful. *Id*. at 177, 669 S.E.2d at 20-21. Had the officers managed to subdue Mr. Dorsey without the use of deadly force, they could have, and almost certainly would have, arrested Mr. Dorsey.

An officer may resort to the use of deadly force "[t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force[.]" N.C. Gen. Stat. § 15A-401(d)(2)(a) (2013). "This portion of the statute 'was designed solely to codify and clarify those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability.'" *Turner v. City of Greenville*, 197 N.C. App. 562, 567, 677 S.E.2d 480, 484 (2009) (citation omitted).

Although Plaintiff presented expert testimony in support of his claim that Mr. Dorsey's hands were not on Officer Carter's weapon at the time Officer Liberto shot Mr. Dorsey, "[a] public official can [only] be held individually liable if it is 'prove[n] that his act, or failure to act, was corrupt or malicious, or that he acted outside of and beyond the scope of his duties.'" *Clayton*, 153 N.C. App. at 492, 570 S.E.2d at 256 (citations omitted). John Eric Combs ("Mr. Combs"), an instructor for the North Carolina Justice Academy, testified

concerning the required "subject control and arrest techniques lesson plan for law enforcement officers" in North Carolina. Mr. Combs testified he did not know if Mr. Dorsey's hands were on the gun at the time Officer Liberto fired the shot, but it would not have changed his opinion that Officer Liberto's use of deadly force was justified. Mr. Combs stated: "We specifically teach in the subject control arrest techniques training program that any attack that includes an attempt to disarm an officer is a deadly force attack." Mr. Combs was asked: "So an officer would be entitled to counter that deadly force with the use of deadly force?" Mr. Combs responded: "Yes, sir." Mr. Combs further opined: "As far as a situation where two officers are around, an assailant grabs an officer's weapon, my suggestion at that point is for the other officer to do exactly what [Officer] Liberto did and use deadly force."

Former SBI Agent Steven Carpenter testified that in his opinion:

> Looking at all the depositions and stuff, and applying North Carolina's General Statute 15a-401, they very, very early in this struggle had every reason in the world to believe [Mr. Dorsey] intended to take that gun and harm somebody. They were responsible for protecting a large number of citizens around them that night. . . . . As a police officer they had a responsibility to protect those people, and, if anything, I don't think they reacted quick enough to ensure that these people did

not meet with serious injury or death.

We hold that the evidence, viewed in the light most favorable to Plaintiff, does not show that the acts of the officers leading to Mr. Dorsey's death were "'corrupt or malicious, or . . . outside of and beyond the scope of [their] duties.'" *Clayton*, 153 N.C. App. at 492, 570 S.E.2d at 256 (citations omitted). We affirm the grant of summary judgment in favor of Officer Carter and Officer Liberto on Plaintiff's claims of wrongful death against the officers in their individual capacities.

Plaintiff also argues the trial court erred in granting summary judgment on Plaintiff's claim of false arrest. Plaintiff's complaint did not contain a claim for false arrest. Plaintiff filed a motion for leave to file first amended complaint, adding a claim for false arrest, four days before the hearing on Defendants' motion for summary judgment. The trial court heard Plaintiff's motion after it had heard Defendants' motion for summary judgment and, at the close of the hearing, stated: "I'm going to take the motion to amend the complaint, as well as the motion for summary judgment under advisement." As Plaintiff acknowledges in his brief, "the [trial court] failed to rule on the motion to amend." "[G]enerally, the failure to obtain a ruling on a motion presented to a trial court renders

the argument raised in the motion unpreserved on appeal. *See* N.C.R. App. P. 10(a)(1) (2012)." *Dep't of Transp. v. Webster*, __ N.C. App. __, __, 751 S.E.2d 220, 223 (2013) *disc. review denied*, __ N.C. __, 755 S.E.2d 618 (2014). The present issue does not fall outside the general rule. Plaintiff has failed to preserve this argument for appellate review. *Id.*

Because of our holdings above, we do not reach Plaintiff's argument concerning contributory negligence.

Affirmed.

Chief Judge MARTIN and Judge CALABRIA concur.