IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-489

No. COA20-438

Filed 21 September 2021

Guilford County, No. 12 CVS 4940

WILLIAM THOMAS FOX and SCOTT EVERETT SANDERS, Plaintiffs,

v.

THE CITY OF GREENSBORO; MITCHELL JOHNSON, individually and in his officially capacities; TIMOTHY R. BELLAMY, individually and in his officially capacities; GARY W. HASTINGS, individually and in his officially capacities; ERNEST L. CUTHBERTSON, individually and in his officially capacities; JOHN D. SLONE, individually and in his officially capacities; NORMAN O. RANKIN, individually and in his officially capacities; AND MARTHA T. KELLY, individually and in her officially capacities, Defendants.

Appeal by Plaintiffs from order entered 14 August 2012 by Judge Joseph Turner and order entered 18 December 2019 by Judge David L. Hall in Guilford County Superior Court. Heard in the Court of Appeals 10 March 2021.

*Morrow, Porter, Vermitsky, & Taylor, PLLC, by John C. Vermitsky, for Plaintiffs-Appellants.*

*Nelson Mullins Riley & Scarborough, LLP, by G. Gray Wilson, Stuart H. Russell, and Lorin J. Lapidus, for Defendants-Appellees.*

WOOD, Judge.

¶ 1       Plaintiffs William Fox ("Fox") and Scott Sanders ("Sanders") (collectively, "Plaintiffs") appeal two separate orders. Plaintiffs first appeal an order dismissing their civil conspiracy and abuse of process claims. Plaintiffs also appeal an order

granting summary judgment in favor of Defendants with respect to their malicious prosecution cause of action. After careful review of the record and applicable law, we affirm in part and reverse in part.

## I. Factual and Procedural Background

In 1984, Defendant Mitchell Johnson ("Defendant Johnson") became employed by the City of Greensboro. In early 2000, Defendant Johnson became the Deputy City Manager. While Defendant Johnson was the Deputy City Manager, the City Manager Ed Kitchen ("Kitchen") asked Defendant Johnson "to review a letter from the NAACP expressing concerns" of racial misconduct within the Greensboro Police Department ("GPD"). In the summer of 2005, while Defendant Johnson's review of the concerns raised was ongoing, Kitchen retired, and Defendant Johnson became the City Manager.

In 2005, Plaintiffs were law enforcement officers with the GPD. Plaintiffs were assigned to the "Special Intelligence Section" ("SIS"), a subdivision of the Special Investigations Division ("SID") within the GPD. The SIS was "a unit designed to investigate, among other things, allegations of criminal police misconduct, outlaw motorcycle gangs, street gangs, dangerous persons, organized crime," and to "protect celebrities or high risk targets visiting Greensboro, North Carolina."

In or around June 2005, GPD Officer James Hinson ("Hinson") and other African American officers raised concerns that Chief of Police David Wray ("Chief

Wray") and "a group of Caucasian officers coined the 'Secret Police' " were racially targeting African American police officers. Hinson alleged the SIS, including Plaintiffs, were involved in the "Secret Police."

¶ 5     The allegations of racial discrimination and targeting centered around the SIS's use of an alleged "Black Book." The "Black Book" was a black binder containing pictures of nineteen African American officers and various male African American individuals allegedly used "as part of an effort to target African American police officers for criminal investigations." The SIS asserted that the "Black Book" was a legitimate investigative tool being used to investigate an allegation of sexual assault by an on-duty African American officer. The "Black Book" contained photographs of minority male officers who were on-duty during the alleged sexual assault of an informant.

¶ 6     Due to the allegations of racial misconduct, Defendant Johnson asked Chief Wray about the NAACP's concerns and the existence of the Black Book. Chief Wray's written response led Defendant Johnson to "believe that [Wray] denied the existence of anything matching the description of the 'Black Book.' " Defendant Johnson reported to the NAACP that the "Black Book" did not exist.

¶ 7     In August 2005, Defendant Johnson attended a meeting with African American GPD officers at their request. During this meeting, Defendant Johnson heard the officers' concerns regarding the Wray administration. Around this time,

Defendant Johnson also learned of concerns regarding the SID from the State Bureau of Investigation ("SBI"). Due to repeated concerns regarding the GPD, Defendant Johnson contacted City Attorneys "to find an outside entity to review the conduct of the Wray administration to determine if there was any truth to the concerns." The City's legal department ("City Legal"), in response, recommended Risk Management Associates ("RMA"), an independent consulting company, to review the Wray administration. Defendant Johnson hired RMA to "review the conduct of the . . . Wray [a]dministration[,]" but "did not ask RMA to investigate any particular individual."

¶ 8 While the RMA investigation was ongoing, Defendant Johnson "had the legal department of the City of Greensboro investigate general administrative issues in the GPD." The RMA report caused Defendant Johnson to believe Chief Wray "had not been truthful about the 'Black Book' and raised other serious concerns about the leadership of the [GPD]." As a result, Defendant Johnson then "chose to place Wray on administrative leave" on January 6, 2006. At that time, Defendant Timothy Bellamy ("Defendant Bellamy"), the Assistant Chief of Police, became the interim Chief of Police. Shortly after Chief Wray was placed on administrative leave, he

resigned as Chief of Police on January 9, 2006.[1]  After Chief Wray's resignation, Defendant Bellamy was tasked with reviewing the RMA and City Legal reports.

¶ 9        Upon his review of the RMA report, Defendant Bellamy had "very serious concerns about the leadership of the Wray administration."  According to the report, Officer Randall Brady ("Brady") revealed to the RMA that "he was keeping in the trunk of his police car a book that matched the description of the 'Black Book.' "  According to Sanders, Brady secured the "Black Book" in the trunk of his patrol vehicle to avoid speculation that the "Secret Police" were showing the "Black Book" to a variety of individuals in an effort to incriminate minority officers.

¶ 10       Upon securing the "Black Book" from Brady's trunk, Defendant Bellamy gave the "Black Book" to Internal Affairs ("IA").  IA then began its investigation.  Thereafter, Defendant Bellamy assigned Captain Gary Hastings ("Defendant Hastings") "with the task of securing and reviewing materials within [SID] . . . for possible criminal activity."  Defendant Hastings "put together a team" of officers from the Criminal Investigation Division ("CID") to review the activity of the SID and Wray administration.

¶ 11       While Defendant Hastings was investigating the SID, Defendant Bellamy met

---

[1] The Federal Bureau of Investigation ("FBI") began an investigation of the Wray administration on January 12, 2006.  The FBI did not substantiate any violation of civil rights or federal law.

with Guilford County District Attorney Doug Henderson ("Henderson") about the RMA report and Defendant Hastings's investigative findings. Henderson informed Defendant Bellamy that the Guilford County District Attorney's Office could not participate in the investigation and that the North Carolina Attorney General's Office would need to be contacted about the concerns regarding alleged criminal conduct within the GPD.

¶ 12          Henderson drafted a letter to Assistant Attorney General James Coman ("Coman") in March 2006. Henderson also wrote a letter to the Director of the SBI, requesting a criminal investigation of the Wray administration on March 13, 2006. On April 4, 2006, Coman responded to Henderson, "accepting responsibility to determine whether or not a criminal investigation should be undertaken by the [SBI]." Coman and a Special Deputy Attorney General traveled to Greensboro throughout April and May 2006 to review police reports and tapes. On June 9, 2006, a meeting was held at the SBI District Office in Greensboro, where it was determined the SBI would mount an investigation of the Wray administration.

¶ 13          Throughout the SBI investigation, agents met with and interviewed approximately seventy-five individuals, including Plaintiffs and Defendants Johnson, Bellamy, and Hastings. Agents also reviewed "69 CDs of audio recordings that were retrieved from Detective Scott Sanders' city computer and other sources." One witness, Dana Bailey ("Bailey"), discussed how Sanders asked her to create lineups

of male African American officers.

¶ 14       Bailey was employed by the GPD in 2000 and worked as an investigative specialist. In or around January 2003, Sanders asked Bailey to put together lineups consisting of five officers. Bailey believed the officers were Hinson, Snipes, Wallace, Fulmore and Norman Rankin ("Defendant Rankin"). Bailey stated her lineups were created using Department of Motor Vehicles ("DMV") photographs, and she cropped any photograph of an officer in uniform "so it looked similar to others in the lineup."

¶ 15       In January 2005, Sanders asked Bailey to put together a list of every officer who had worked on a particular date and shift. Bailey did so, and Sanders requested "16 or 17 more lineups," and told her "the request was by the authority of Deputy Chief Brady." Bailey created the lineups, and she mentioned in her SBI interview that "all of the officers she did lineups on were black." Sanders did not mention what the lineups were for, nor did Bailey "want to know what they were for." During the investigation of the GPD, Bailey reported some computers were taken for investigation, but one of hers was not. "[I]t bothered [Bailey] that a complete investigation would not be done if that computer was not taken and looked at."

¶ 16       Defendant Hastings was also interviewed by the SBI. Defendant Hastings's interview revealed Defendant Bellamy "designated Hastings as the operational commander for the inventory, review, and analysis of the seized property belonging to the [SID]." Defendant Hastings "was made the commander for any subsequent

criminal investigation involving any allegation or evidence of a crime." Defendant Hastings stated the CID "seized a 'ton' of stuff including electronic media, such as audio cassette tapes, VHS tapes, other video tapes, recordable CDs, computer drives, cellular telephones, and recordable DVDs." While Defendant Hastings was investigating the SID, Defendant Bellamy re-assigned members of the SIS and SID to other divisions.

¶ 17        While Defendant Hastings and his team were reviewing the materials seized from the SID, Defendant Hastings "recalled that one of his homicide detectives, [Defendant Rankin], had been transferred from his division to Special Intelligence." Defendant "Hastings ha[d] received information that Officer John Sloan[2] [sic] ("Defendant Slone") had been instructed to keep [Defendant Rankin] busy in some investigation that he had been assigned to handle." Defendant Hastings "suspected [Defendant] Rankin was placed in Special Intelligence and assigned some investigation as window-dressing to offset the perception that black officers in that unit were not allowed to investigate other officers."

¶ 18        Defendant Rankin was also interviewed during the SBI investigation. Brady assigned Defendant Rankin to the SID to work on a special assignment on June 23, 2005. Defendant Rankin was tasked with investigating "a sensitive matter,"

---

[2] Throughout the record, Defendant Slone is referred to as "Sloan." It appears from the complaint and the parties' briefing that the appropriate spelling is "Slone."

involving an informant. When Brady assigned Defendant Rankin to the SID, he called Fox and Ernest Cuthbertson ("Defendant Cuthbertson") to help investigate the case. During this meeting, Brady "made some comment about [Sanders] being tied up on the . . . Hinson investigation and some other things and that was why he needed to assign the case to [Defendants] Rankin and Cuthbertson."

¶ 19       Defendant Rankin was assigned to investigate allegations that certain GPD officers solicited prostitutes. Defendant Rankin was instructed to contact Sanders because Sanders had additional information about the case. Defendant Rankin did so, and Sanders provided him with names and contact information. The allegations regarding prostitution came from an informant who went by the name "CC." Defendant Rankin recalled CC would only speak with Defendant Slone.

¶ 20       Defendants Slone and Rankin discussed CC, and why CC was important to the investigation. Defendant Slone later told Defendant Rankin that "Sloan [sic] had been instructed to lead [Defendants] Rankin and Cuthbertson in the wrong direction and give them false information to keep them from ever meeting with [the informant]."

¶ 21       In his SBI interview, Defendant Slone discussed a phone call he received from Sanders. Sanders told Defendant Slone the SID was not working the investigation, but Chief Wray had assigned Defendants Rankin and Cuthbertson to investigate the case. Defendant Slone detailed a meeting he had with Plaintiffs, where Plaintiffs

expressed concerns regarding Defendants Rankin and Cuthbertson's competency. Defendant Slone was led to believe "by Brady, Fox, and Sanders" that Defendants Cuthbertson and Rankin were "dirty cops." According to Defendant Slone, he was assigned to work the case, and was tasked with ensuring Defendants Rankin and Cuthbertson did not obtain certain evidence. Defendant Slone also told SBI agents that Plaintiffs were to be blind copied on any e-mails between Defendants Slone, Rankin, and Cuthbertson.

¶ 22        Winston-Salem law enforcement officer Theodore Hill ("Hill") corroborated Defendant Slone's statements.[3] Hill recounted a meeting he attended with Defendant Slone and two detectives at a gas station parking lot. "Hill related that [Defendant Slone] was trying to give the other detectives some information he had obtained," but the detectives "did not want it because if they took the information, they would have to give it to whoever was working on some case." Hill recalled the information Defendant Slone was trying to give to the detectives "was supposed to be a picture of a police officer with a stripper or someone else."

¶ 23        Defendant Slone and Hill's statements to the SBI are further corroborated by Defendant Rankin's interview. Defendant Rankin was assigned to investigate

---

[3] Fox filed "truthfulness concerns" regarding Defendant Slone, alleging Defendant Slone's statements were inconsistent. GPD Sergeant Mike Loy ("Loy"), working in IA, drafted a memorandum regarding Defendant Slone's inconsistent statements. Notably, Defendant Slone's statements are corroborated, in part, by Hill and Defendant Rankin.

allegations of police officers soliciting prostitutes. After Defendant Rankin received his assignment, he thought "it was like an invisible wall was being put up to keep him from talking to" the informant. Later, Defendant Slone admitted to Defendant Rankin he was asked to "lead [Defendants] Rankin and Cuthbertson in the wrong direction and give them false information to keep them from ever meeting with the informant."

¶ 24        Fox also participated in the SBI investigation. Fox denied knowing Sanders was getting blind copies of e-mails between officers and claimed he was led to believe CC "and [Defendant Rankin] did not get along." He further denied "setting [Defendant] Rankin up to fail."

¶ 25        Throughout their investigation, SBI agents became concerned that Plaintiffs obstructed investigations and unlawfully accessed a federal government computer. Specifically, the agents were concerned Sanders accessed a federal computer assigned to officer Julius Fulmore ("Fulmore").

¶ 26        Fulmore had been assigned a laptop computer by an agent of the Department of Housing and Urban Development ("HUD") and used the laptop until June 4, 2004. Fulmore did not allow any other officer to use the computer, and it was in his sole possession. Fulmore told SBI agents that Sanders went to the HUD agent for consent to search the HUD laptop twice. The HUD agent did not consent to a search and told Sanders he would need Fulmore's permission or a letter from Sanders's supervisor

requesting permission to access the computer. Fulmore did not consent to any individual searching the HUD computer and the record does not reveal a request from Sanders or his supervisor for permission to access the laptop.

¶ 27 On December 20, 2003, Sanders asked SBI agent Gary Rick Cullop ("Cullop") to examine a computer for him. Cullop stated he removed the hard drive from the computer and made a "mirror copy" of the hard drive. According to Cullop's SBI interview, "he did not know by what consent he searched the computer for Sanders." Cullop believed "someone in Sanders' chain of command gave permission for the search." Cullop did not know the computer was owned by HUD and the federal government.

¶ 28 On September 18, 2006, the SBI agents investigating the Wray administration presented Cullop with a computer. The computer SBI agents presented to Cullop was the same computer given to Fulmore by the HUD agent. Cullop confirmed that the computer he inspected for Sanders was the same computer presented to him on September 18, 2006.[4]

¶ 29 On September 17, 2007, Sanders was indicted for one count of accessing a government computer in violation of N.C. Gen. Stat. § 14-454.1(b); felonious obstruction of justice; and felonious conspiracy "to undermine a legitimate criminal

---

[4] Cullop was able to confirm the computer presented by the SBI agents was the same computer he examined for Sanders by matching the serial number from the computer to his notes.

investigation." That same day, Fox was indicted for felonious obstruction of justice and felonious conspiracy to obstruct justice. Plaintiffs were arrested on September 21, 2007.[5] Consequently, Plaintiffs were suspended without pay and were instructed not to issue any comments regarding the investigation.

¶ 30 Sanders's criminal trial for one count of accessing a government computer began on February 16, 2009. During Sanders's trial, Defendant Hastings testified on his behalf and was believed to be a beneficial witness for Sanders. Four days later, Sanders was acquitted of accessing a government computer. The remaining charges against both Plaintiffs were dismissed on February 23, 2009.[6]

¶ 31 On April 1, 2011, Plaintiffs brought suit against the City of Greensboro; Defendants Bellamy, Hastings, Slone, Cuthbertson, Johnson, and Martha Kelly ("Defendant Kelly"); and the RMA in the federal district court for the Middle District of North Carolina. The District Court dismissed all of Plaintiffs' asserted causes of action, upon motion by the named defendants, on August 27, 2011. *See Fox v. City of Greensboro, et al.*, 807 F. Supp. 2d 476 (M.D.N.C. 2011).

¶ 32 On January 20, 2012, Plaintiffs filed suit against Defendants Johnson,

---

[5] Plaintiffs speculate that former Attorney General Roy Cooper, judges, politicians, and the SBI's political motivations caused Coman to seek criminal indictments.

[6] Coman's affidavit demonstrates he "told the attorneys for Sanders and Fox that if Sanders was acquitted, [Coman] would drop all remaining criminal charges against Sanders and Fox." Plaintiffs' attorney, Seth Cohen, submitted an affidavit corroborating this statement.

Bellamy, Hastings, Kelly,[7] Slone, Rankin, and Cuthbertson in Forsyth County Superior Court (collectively, "all Defendants"). Plaintiffs asserted a civil conspiracy cause of action against all Defendants in both their official and individual capacities. Plaintiffs further alleged abuse of process and malicious prosecution causes of action against Defendants Johnson, Bellamy, Hastings, and Kelly in both their official and individual capacities. Plaintiffs asserted additional claims for declaratory judgment and punitive damages.

¶ 33 Plaintiffs allege Defendant Johnson wrongfully ordered the investigation of Plaintiffs, directed City Attorneys to lie to Plaintiffs, controlled the flow of information to the SBI, instigated Plaintiffs' arrest, and failed to provide the SBI with exculpatory information. It was further alleged Defendant Johnson provided City Council with false and misleading information about the "Black Book," and improperly provided the media and public with false and misleading information.[8]

¶ 34 Regarding Defendant Bellamy, Plaintiffs contend he "help[ed] to create false accusations that [Plaintiffs] were wrongfully targeting minority officers"; controlled

---

[7] We need not address the merits of Plaintiffs' claims regarding Defendant Kelly. Plaintiffs voluntarily dismissed their claims against Defendant Kelly on October 8, 2018. *See Hous. Auth. of City of Wilmington v. Sparks Eng'g. PLLC*, 212 N.C. App. 184, 187, 711 S.E.2d 180, 182 (2011).

[8] Throughout the investigations of the Wray administration, Defendants Johnson and Bellamy engaged in press releases regarding the "Black Book." Plaintiffs contend the statements made to the press, as well as statements made to City Council, were inflammatory, misleading, and false. Plaintiffs further contend these statements played a role in the SBI investigation and the decision to criminally indict Plaintiffs.

the flow of information to the RMA, City Attorneys, and SBI; and provided false and misleading information during the multiple investigations of the Wray administration. According to Plaintiffs' complaint, Defendant Bellamy "helped to create a false transcript" of an audio recording between Sanders, Wray, and others; failed to provide exculpatory information regarding Plaintiffs' criminal charges; and "[failed] to timely act to investigate . . . truthfulness allegations" that Defendant Slone provided false information during the investigations.

¶ 35   Defendant Hastings was accused of aiding in the creation of false accusations against Plaintiffs; "[a]uthoring memorandum accusing [Plaintiffs] of illegal and immoral conduct"; instructing Defendant Kelly to destroy memoranda regarding the investigation of Plaintiffs; and helped to create a false transcript of an audio recording involving Sanders. Plaintiffs further alleged Defendant Hastings provided false and misleading information to City Council and police personnel.

¶ 36   Plaintiffs contend Defendants Slone, Rankin, and Cuthbertson participated in creating false accusations against Plaintiffs, and knowingly provided the RMA and SBI with false or misleading information during the investigations of the Wray administration. It was further alleged that Defendant Kelly, a GPD Captain, knew of the false information provided during the SBI investigation and failed to take appropriate action. Defendant Kelly was further accused of destroying memoranda regarding the investigations, including a memorandum referred to as "Memo 9."

Memo 9 allegedly "contained exculpatory evidence that [Plaintiffs] had not acted improperly."

¶ 37     All Defendants moved to dismiss Plaintiffs' complaint for improper venue, failure to state a claim upon which relief can be granted, and failure to comply with Rule 9 of our rules of civil procedure. The case was transferred to Guilford County Superior Court by consent order in March 2012.

¶ 38     The Guilford County Superior Court granted all Defendants' motion to dismiss in part, dismissing Plaintiffs' civil conspiracy and abuse of process claims on August 13, 2012. The trial court denied Defendants Johnson, Bellamy, and Hastings's motion to dismiss Plaintiff's malicious prosecution cause of action. Plaintiffs appealed to this Court on September 13, 2012.

¶ 39     Plaintiffs' appeal was dismissed as interlocutory on October 1, 2013.[9] *See Fox v. City of Greensboro*, No. 13-171-2, 2013 N.C. App. LEXIS 1321 (N.C. Ct. App. Dec. 17, 2013). Plaintiffs filed a petition for discretionary review with the North Carolina Supreme Court on January 21, 2014. This petition was denied in April 2014.

¶ 40     Defendants Johnson, Bellamy, Hastings, and Kelly moved for judgment on the pleadings on the basis of collateral estoppel in the Guilford County Superior Court on

---

[9] Plaintiffs' appeal was originally heard on August 13, 2013, and an opinion was filed on October 1, 2013. Plaintiffs filed a petition for rehearing on November 1, 2013, which was allowed on November 21, 2013. On December 17, 2013, a superseding opinion was issued, dismissing Plaintiffs' appeal as interlocutory.

August 4, 2014. These Defendants contended Plaintiffs' malicious prosecution claim was barred by the doctrine of collateral estoppel "given the final judgment in the prior case *Fox v. City of Greensboro*, 807 F. Supp. 2d 476 (M.D.N.C. 2011)." This motion was denied.

¶ 41 On October 16, 2014, Defendants Johnson, Bellamy, Hastings, and Kelly appealed to this Court. This Court issued its opinion on October 6, 2015, holding, "Plaintiffs are not collaterally estopped from bringing their malicious prosecution claims under state law." *Fox v. Johnson*, 243 N.C. App. 274, 288, 777 S.E.2d 314, 325 (2015). These Defendants petitioned our Supreme Court for discretionary review on November 9, 2015. The petition for discretionary review was denied on January 28, 2016. On May 12, 2016, this case was designated as exceptional pursuant to Rule 2.1(a) of the General Rules of Practice. Thereafter, the parties engaged in discovery.

¶ 42 Plaintiffs and Defendants Johnson, Bellamy, Hastings, and Kelly were deposed. Sanders conceded in his deposition that he had "no personal knowledge of any discussion or conversation any defendant had with anyone at the SBI," other than reading through their SBI interviews "after the fact." Sanders further conceded that he "had no personal knowledge of any of these [D]efendants" instructing other law enforcement officers "not to provide information to the SBI." When asked about the contents of Memo 9, Sanders admitted he did not know if it related to the criminal charges brought against him.

¶ 43    During Fox's deposition, he conceded he did not know the contents of Memo 9, and he "[did not] know what that memo had to do with." Fox testified he had "very little contact" with Defendants Bellamy and Hastings. Fox conceded that he did not believe "the charges were personal against [him,]" but that the charges "were just a means to an end." Further, Fox stated his belief that Defendant Hastings's "actions or motivation was prompted by [Hastings's] relationship with Wray."

¶ 44    Defendants Johnson, Bellamy, and Hastings moved for summary judgment with respect to Plaintiffs' malicious prosecution claim in July 2019. The trial court granted this motion on November 6, 2019. Plaintiffs appealed on December 31, 2019.

## II.    Discussion

¶ 45    Plaintiffs raise several arguments on appeal, each will be addressed in turn.

### A. Motion for Summary Judgment

¶ 46    Plaintiffs first contend the trial court erred in granting summary judgment in favor of Defendants Johnson, Bellamy, and Hastings with respect to Plaintiffs' malicious prosecution cause of action. Defendants Johnson, Bellamy, and Hastings contend Plaintiffs' claim is barred by the affirmative defense of governmental immunity.

¶ 47    We review the "grant of a motion for summary judgment . . . [to determine] whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law." *Becker v. Pierce*, 168 N.C. App. 671, 674,

608 S.E.2d 825, 828 (2005) (quoting *Hoffman v. Great Am. Alliance Ins. Co.*, 166 N.C.

App. 422, 425, 601 S.E.2d 908, 911 (2004)).

> A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense. Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial.

*Hoffman*, 166 N.C. App. at 424-26, 601 S.E.2d at 911 (internal quotation marks and

citations omitted). Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that any party is

entitled to judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2021).

> In order to support a malicious prosecution claim, [a] plaintiff must establish the following four elements: "(1) defendant initiated the earlier proceeding; (2) malice on the part of defendant in doing so; (3) lack of probable cause for the initiation of the earlier proceeding; and (4) termination of the earlier proceeding in favor of the plaintiff."

*Martin v. Parker*, 150 N.C. App. 179, 182, 563 S.E.2d 216, 218 (2002) (quoting *Best v.*

*Duke Univ.*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994)); *see also Cook v. Lanier*,

267 N.C. 166, 169, 147 S.E.2d 910, 914 (1966). "In cases for malicious prosecution in

which the earlier proceeding is civil, rather than criminal, in nature, our courts require a plaintiff to additionally plead and prove a fifth element: 'special damages.' " *Fuhs*, *v. Fuhs*, 245 N.C. App. 367, 372, 782 S.E.2d 385, 388 (2016).

¶ 48        Here, the parties do not dispute the "earlier proceeding" terminated "in favor of the plaintiff," as Sanders was acquitted of accessing a federal computer and the remaining charges against Plaintiffs were dismissed.  Nor do the parties dispute that the earlier proceeding was criminal in nature.  Thus, our review is limited to the remaining elements.

### 1. *Governmental Immunity*

¶ 49        Because Defendants Johnson, Bellamy, and Hastings contend Plaintiffs' malicious prosecution and civil conspiracy claims are barred by the affirmative defense of governmental immunity, we first determine whether these Defendants acted with malice.  *See Lambert v. Town of Sylva*, 259 N.C. App. 294, 301, 816 S.E.2d 187, 193 (2018) ("Governmental immunity is an affirmative defense."); *see also Turner v. City of Greenville*, 197 N.C. App. 562, 566, 677 S.E.2d 480, 483 (2009).  "An affirmative defense is a defense that introduces a new matter in an attempt to avoid a claim, regardless of whether the allegations of the claim are true."  *Strickland v. Hedrick*, 194 N.C. App. 1, 10, 669 S.E.2d 61, 37 (2008) (quoting *Williams v. Pee Dee Elec. Membership Corp.*, 130 N.C. App. 298, 301-02, 502 S.E.2d 645, 647-48 (1998)).

¶ 50        "Under the doctrine of governmental immunity, a municipality is not liable for

the torts of its officers and employees if the torts are committed while they are performing a governmental function." *Taylor v. Ashburn*, 112 N.C. App. 604, 607, 436 S.E.2d 276, 278 (1993) (citations omitted). When individual officers are named as defendants, the action "is one against the State for the purposes of applying the doctrine of sovereign immunity." *Houpe v. City of Statesville*, 128 N.C. App. 334, 341, 497 S.E.2d 82, 87 (1998). "[T]he actions of a city and its officials in investigating and disciplining a city police officer accused of criminal activity are likewise encompassed within the rubric of 'governmental functions.' " *Id.* at 341, 497 S.E.2d at 87.

¶ 51        While police officers are "public officials" for the purposes of governmental immunity, they "are not shielded from liability if their alleged actions were corrupt or malicious . . . ." *Shuping v. Barber*, 89 N.C. App. 242, 248, 365 S.E.2d 712, 716 (1988) (citations omitted); *see also Strickland*, 194 N.C. App. at 10, 669 S.E.2d at 67; *Cline v. James Bane Home Bldg., LLC.*, ___ N.C. App. ___, 2021-NCCOA-266, ¶26 ("Public official's immunity precludes suits against public officials in their individual capacities and protects them from liability '[a]s long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption . . . .' " (citation omitted)). "[A]n official may be held liable when he acts maliciously or corruptly, when he acts beyond the scope of his duties, or when he fails to act at all." *Turner*, 197 N.C. App. at 566, 677 S.E.2d at 483 (citation omitted). Thus, only

tortious "actions that are malicious, corrupt, or outside the scope of official duties will pierce the cloak of official immunity." *Id.* (citation, internal quotation marks, brackets, and ellipsis omitted). "[I]f the plaintiff alleges an intentional tort claim, a determination of governmental immunity is unnecessary since, in such cases, neither a public official nor a public employee is immunized from suit in his individual capacity." *Beck v. City of Durham*, 154 N.C. App. 221, 230, 573 S.E.2d 183, 189 (2002) (citation, internal quotation marks, and brackets omitted).

¶ 52     A plaintiff alleging malicious or intentional acts by a governmental official faces a high bar:

> It is well settled that absent evidence to the contrary, it will always be presumed that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law. This presumption places a heavy burden on the party challenging the validity of public officials' actions to overcome this presumption by competent and substantial evidence. Moreover, evidence offered to meet or rebut the presumption of good faith must be sufficient by virtue of its reasonableness, not by mere supposition. It must be factual, not hypothetical; supported by fact, not by surmise.

*Strickland*, 194 N.C. App. at 10-11, 669 S.E.2d at 68 (citations, internal quotation marks, and brackets omitted.) Thus, to determine whether Plaintiffs' malicious prosecution claim against Defendants Johnson, Bellamy, and Hastings in their official capacities is barred under the doctrine of government immunity, we must first determine whether Defendants Johnson, Bellamy, and Hastings acted with malice.

¶ 53    "In order to give a cause of action for malicious prosecution, such prosecution must have been maliciously instituted." *Cook*, 267 N.C. at 170, 147 S.E.2d at 914 (citations omitted). " 'Malice' in a malicious prosecution claim may be shown by offering evidence that defendant 'was motivated by personal spite and a desire for revenge' or that defendant acted with ' "reckless and wanton disregard" ' for plaintiffs' rights." *Becker*, 168 N.C. App. at 676, 608 S.E.2d at 829 (citation omitted); *see also Moore v. City of Creedmoor*, 345 N.C. 356, 371, 481 S.E.2d 14, 24 (1997) (citation omitted).

¶ 54    Plaintiffs must "offer evidence tending to prove that the wrongful action of instituting the prosecution was done for actual malice in the sense of personal ill-will, or under the circumstances of insult, rudeness or oppression, or in a manner which showed the reckless and wanton disregard of [Plaintiffs'] rights." *Mathis v. Dowling*, 230 N.C. App. 311, 316, 749 S.E.2d 284, 288 (2013) (citation omitted). "In an action for malicious prosecution, the malice element may be satisfied by a showing of either actual or implied malice. Implied malice may be inferred from want of probable cause in reckless disregard of the plaintiff's rights." *Kirschbaum v. McLaurin Parking Co.*, 188 N.C. App. 782, 789-90, 656 S.E.2d 683, 688 (2008) (quoting *Nguyen v. Burgerbusters, Inc.*, 182 N.C. App. 447, 452, 642 S.E.2d 502, 506-07 (2007)).

> Evidence that the chief aim of the prosecution was to
> accomplish some collateral purpose, or to forward some
> private interest, e.g., to enforce collection of a debt is

> admissible both to show the absence of probable cause and
> to create an inference of malice, and such evidence is
> sufficient to establish a prima facie want of probable cause.

*Cook*, 267 N.C. at 170, 147 S.E.2d at 914 (citation, internal ellipses, and alteration

omitted).

¶ 55    Here, Plaintiffs contend Defendants Johnson, Bellamy, and Hastings acted

with ill-will by "with[holding] exculpatory evidence from the SBI in an effort to incite

criminal charges against Plaintiffs"; "destroy[ing] exculpatory evidence";

"manipulating the 'black book' by providing a modified version to the SBI"; and

providing false or misleading statements to the SBI, media, and to fellow law

enforcement officers.

¶ 56    A review of the record, however, demonstrates that Plaintiffs lack specific

knowledge of what information Defendants Johnson, Bellamy, and Hastings provided

to the SBI. Specifically, Sanders conceded in his deposition that he had "no personal

knowledge of any discussion or conversation any defendant had with anyone at the

SBI," other than reading through their SBI interviews "after the fact." Sanders

further conceded that he "had no personal knowledge of any of these defendants"

instructing other law enforcement officers "not to provide information to the SBI."

Assuming *arguendo* that there were inconsistencies in Defendants Johnson, Bellamy,

and Hastings's SBI, IA, and RMA interviews, Plaintiffs failed to establish these

inconsistencies were intentional and not mere misstatements over the course of an

approximately two-year long investigation.

¶ 57        Further, Plaintiffs thought Chief Wray was "the real target of the SBI's investigation." Fox testified during his deposition that he had "very little contact," with Defendants Bellamy and Hastings. Fox conceded that he did not believe "the charges were personal against [him,]" but that the charges "were just a means to an end." Further, Fox stated his belief that Defendant Hastings's "actions or motivation was prompted by [Defendant Hastings's] relationship with Wray." Moreover, Defendant Hastings testified in Sanders's criminal trial, and was found to be "a helpful witness" for Sanders.

¶ 58        Notably, Plaintiffs do not argue the actions taken by Defendants Johnson, Bellamy, and Hastings were against departmental policy or standard procedure where there are concerns of racial and criminal misconduct within a police department. While Plaintiffs take issue with their suspension; a "gag order," that prevented them from speaking about their pending criminal charges; and statements made during several investigations, Plaintiffs do not argue this was an unusual response to public concerns of corruption and racial misconduct. Because Plaintiffs failed to show any statement was made maliciously, "in the sense of personal ill-will," we find Plaintiffs' malicious prosecution claim against Defendants Johnson, Bellamy, and Hastings in their official capacities is barred by the doctrine of governmental immunity.

### 2. *Probable Cause*

¶ 59    "Where the claim is one for malicious prosecution, probable cause has been properly defined as the existence of such facts and circumstances, known to the defendants at the time, as would induce a reasonable man to commence a prosecution." *Best*, 337 N.C. at 749, 448 S.E.2d at 510 (internal quotation marks, alterations, and citations omitted); *see also Cook*, 267 N.C. at 170, 147 S.E.2d at 914 (citation omitted). "Whether probable cause exists is a mixed question of law and fact," however, "the existence of probable cause is a question of law for the court." *Best*, 337 N.C. at 750, 448 S.E.2d at 510 (citing *Cook*, 367 N.C. at 171, 147 S.E.2d at 914).

¶ 60    To determine probable cause, we must consider "whether a man of ordinary prudence and intelligence under the circumstance would have known that the charge had no reasonable foundation." *Wilson v. Pearce*, 105 N.C. App. 107, 113-14, 412 S.E.2d 148, 151 (1992) (citation omitted). "The critical time for determining whether or not probable cause existed is when the prosecution begins." *Hill v. Winn-Dixie Charlotte, Inc.*, 100 N.C. App. 518, 521, 397 S.E.2d 347, 349 (1990) (citation omitted). The existence of probable cause will defeat a malicious prosecution claim. *Adams v. City of Raleigh*, 245 N.C. App. 330, 335, 782 S.E.2d 108, 113 (2016). "Probable cause does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability that incriminating evidence is involved is

all that is required." *Id.* at 337, 782 S.E.2d at 114 (internal quotation marks and citation omitted). "A probability of illegal activity . . . is sufficient." *Id.* (citation omitted).

¶ 61    Here, there was substantial evidence to support a "probability" that Sanders had impermissibly accessed a government computer. While Plaintiffs contend all Defendants provided false and misleading information during the SBI investigation, Plaintiffs do not contest Cullop's assertions that Sanders asked Cullop to make a "mirror copy" of a laptop computer. Nor do Plaintiffs argue Cullop's notes regarding the serial number of the laptop he examined are inaccurate. Further, the HUD agent that allowed Fulmore to use the laptop in question made several statements to the SBI regarding Sanders's requests to access Fulmore's computer. Moreover, Sanders conceded in his IA interview that he "placed [a] monitoring device[]" on a city computer. Sanders further stated he put a "key-catcher" device on two officers' computers, in order to capture these officers' usernames and passwords.

¶ 62    There was also evidence presented that would lead "a man of ordinary prudence and intelligence" to believe Plaintiffs obstructed justice and conspired to do so. Defendant Slone stated in his SBI interview Sanders had instructed him not to provide certain evidence to Defendant Rankin during a meeting between Defendant Slone and Plaintiffs. While Plaintiffs argue this statement was false, misleading, and inconsistent with Defendant Slone's statements during the IA and RMA

investigations, Hill corroborated Defendant Slone's statements. Hill recounted the meeting he attended with Defendant Slone and two detectives. "Hill related that [Defendant Slone] was trying to give the other detectives some information he had obtained," but the detectives "did not want it because if they took the information, they would have to give it to whoever was working on some case." Hill recalled the information Defendant Slone was trying to give to the detectives "was supposed to be a picture of a police officer with a stripper or someone else."

¶ 63 Defendant Slone and Hill's statements to the SBI are further corroborated by Defendant Rankin's interview. Defendant Rankin was assigned to investigate allegations of police officers soliciting prostitutes. After Defendant Rankin received his assignment, he thought "it was like an invisible wall was being put up to keep him from talking to" an informant. Later, Defendant Slone admitted he was asked to "lead [Defendants] Rankin and Cuthbertson in the wrong direction and give them false information to keep them from ever meeting with the informant."

¶ 64 Based upon Defendants Slone and Rankin's statements to the SBI, corroborated in part by Hill, "a reasonable and prudent man, under the circumstances" would believe the obstruction of justice charge was not without a foundation. Our review reveals Plaintiffs failed to meet their burden to show that Defendants Johnson, Bellamy, and Hastings acted with malice or without probable cause. We hold the trial court did not err by granting summary judgment with

respect to Plaintiffs' malicious prosecution cause of action.

**B. Motion to Dismiss**

Plaintiffs contend that the trial court erred in granting Defendants' motions to dismiss their civil conspiracy and abuse of process claims. We review an order granting a motion to dismiss *de novo. S.N.R. Mgmt. Corp. v. Danube Partners, 141, LLC*, 189 N.C. App. 601, 606, 659 S.E.2d 442, 447 (2008). We consider "whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true." *Chidnese v. Chidnese*, 210 N.C. App. 299, 304, 708 S.E.2d 725, 730 (2011).

As a preliminary matter, we note, "North Carolina is a notice pleading state." *White v. Trew*, 366 N.C. 360, 363, 736 S.E.2d 166, 168 (2013) (citation omitted).

> Under the "notice theory of pleading" a statement of claim is adequate if it gives sufficient notice of the claim asserted "to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine res judicata, and to show the type of case brought."

*Sutton v. Duke*, 277 N.C. 94, 102, 176 S.E.2d 161, 165 (1970) (citation and internal alteration omitted); *see also Hill v. Perkins*, 84 N.C. App. 644, 647, 353 S.E.2d 686, 688 (1987). Under our State's notice theory of pleading, plaintiffs must allege facts, not mere conclusions, to support their asserted causes of action. *See Sutton*, 277 N.C. at 98-99, 176 S.E.2d at 163. "While the concept of notice pleading is liberal in nature, a complaint must nonetheless state enough to give the substantive elements of a

legally recognized claim or it may be dismissed under Rule 12(b)(6)." *Raritan River Steel Co. v. Cherry, Bekart, & Holland*, 322 N.C. 200, 205, 367 S.E.2d 609, 612 (1988) (citation omitted). However, "if a complaint pleads facts which serve to defeat the claim it should be dismissed." *Id.* (citing *Sutton*, 277 N.C. at 102, 176 S.E.2d at 166).

### 3. *Civil Conspiracy*

¶ 67    Plaintiffs contend the trial court erred in dismissing their civil conspiracy cause of action against Defendants Johnson, Bellamy, Hastings, Kelly, Slone, Rankin, and Cuthbertson. Specifically, Plaintiffs contend they sufficiently alleged the cause of action under Rule 8 of our rules of civil procedure. *See* N.C. Gen. Stat. § 1A-1, Rule 8(a) (2021). All Defendants contend that if Plaintiffs sufficiently pled factual allegations to survive a motion to dismiss, Plaintiffs' civil conspiracy claim is barred by the doctrines of intra-corporate or government immunity.

¶ 68    We note "that there is not a separate civil action for civil conspiracy in North Carolina." *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) (citing *Shope v. Boyer*, 268 N.C. 401, 404-05, 150 S.E.2d 771, 773-74 (1966); *Fox v. Wilson*, 85 N.C. App. 292, 300, 354 S.E.2d 737, 742-43 (1987)).

> In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts. The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all.

*Shope*, 268 N.C. at 405, 150 S.E.2d at 773-74 (citation omitted); *Fox*, 85 N.C. App. at 301, 354 S.E.2d at 743 (citation and quotation marks omitted); *see also Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981) ("The common law action for civil conspiracy is for damages caused by acts committed pursuant to a conspiracy rather than for the conspiracy, i.e., the agreement, itself." (citation and internal alteration omitted)).

> A threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed. The existence of a conspiracy requires proof of an agreement between two or more persons. Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury.

*Dove*, 168 N.C. App. at 690-91, 608 S.E.2d at 801 (internal citations and quotation marks omitted). "Thus to create civil liability for conspiracy," *Dickens*, 302 N.C. at 456, 276 S.E.2d at 357, the Plaintiffs must have alleged "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do an lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Privette v. Univ. of North Carolina*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989) (citation omitted); *see also Elliott v. Elliott*, 200 N.C. App. 259, 264, 683 S.E.2d 405, 409 (2009). Circumstantial evidence may be used to prove the existence of an agreement; however, "the evidence of the agreement

must be sufficient to create more than a suspicion or conjecture in order to justify submission of the issue to a jury." *Dickens*, 302 N.C. at 456, 276 S.E.2d at 337 (citing *Edwards v. Ashcraft*, 201 N.C. 246, 159 S.E. 355 (1931). *See also State v. Martin*, 191 N.C. 404, 132 S.E. 16 (1926)).

¶ 69        "We must judge the sufficiency of the complaint by the facts alleged and not by the pleader's conclusions. . . . The repeated use of the words combined, conspired, and agreed together to injure [Plaintiffs] . . . [are] insufficient." *Shope*, 268 N.C. at 405, 150 S.E.2d at 774 (internal citation omitted). Recovery, in the context of a civil conspiracy claim, "must be on the basis of [the sufficiency] of [the] alleged wrongful overt acts." *Dove*, 168 N.C. App. at 690, 608 S.E.2d at 800 (citation omitted).

¶ 70        Here, Plaintiffs' "claims [are] essentially derived from allegations that [Defendants] knowingly gave false information" to the RMA and SBI. *See Hawkins v. Webster*, 78 N.C. App. 589, 590, 337 S.E.2d 682, 683 (1985). This Court, however, has previously held that "[a] civil action may not be maintained for a conspiracy to give false testimony." *Id.* at 592, 337 S.E.2d at 684 (citation omitted). In *Hawkins*, this Court affirmed the dismissal of a civil conspiracy claim where the plaintiff alleged "defendants knowingly gave false information to the FBI and IRS agents who conducted the investigation that resulted in criminal charges being filed against [the plaintiff]." *Id.* at 590, 337 S.E.2d at 683. Similarly, this Court declined to find a civil conspiracy cause of action where a plaintiff alleged "the Defendants conspired

together to commit the unlawful acts of having Plaintiffs falsely arrested and assert[ed] that Defendants 'knowingly provid[ed] false and misleading affidavits and other false information in order to secure the issuance of [] bogus arrest warrants." *Strickland*, 194 N.C. App. at 19, 669 S.E.2d at 72-73 (internal quotation marks omitted).

¶ 71      Moreover, Plaintiffs failed to allege any specific factual allegations about the purported conspiracy. Plaintiffs' complaint is devoid of any factual allegations regarding a meeting or agreement between all Defendants. While Plaintiffs pleaded all Defendants "reached an agreement," and "agreed to gather information," such claims constitute mere conclusions regarding an alleged agreement. *See Shope*, 268 N.C. at 405, 150 S.E.2d at 774. The complaint is devoid of any factual allegations regarding how or when all Defendants reached such an agreement.

¶ 72      Viewing Plaintiffs' complaint in light of our precedent, "a conspiracy to provide false [statements] in order to secure Plaintiffs' arrest . . . is not recognized in North Carolina." *Strickland*, 194 N.C. App. at 19, 669 S.E.2d at 73. Therefore, the trial court did not err when it dismissed Plaintiffs' civil conspiracy cause of action. As Plaintiffs failed to sufficiently plead factual allegations to support their claim of civil conspiracy, we need not address whether Plaintiffs' claim is barred by the affirmative defenses of intra-corporate immunity or government immunity.

**C. Abuse of Process**

¶ 73      Next, Plaintiffs contend the trial court erred in dismissing their abuse of process claim asserted against Defendants Johnson, Bellamy, and Hastings. The trial court's order dismissing Plaintiffs' claim for abuse of process does not provide its reasoning for granting the motion to dismiss. On appeal, however, Plaintiffs first address whether their claim was barred by the applicable statute of limitations. The parties dispute whether Plaintiffs preserved any remaining arguments regarding the sufficiency of their pleadings with respect to this cause of action.

### 1. *Statute of Limitations*

¶ 74      Plaintiffs first contend their abuse of process claim is not barred by the applicable statute of limitations because the limitations period commences upon "the termination of the acts which constitute the abuse complained of." *See* 1 AM.JUR.2d, Abuse of Process, § 27. Because to support a claim of abuse of process, Plaintiffs must sufficiently plead acts that occur after the institution of the process, we conclude that the limitations period commences upon the last tortious act about which Plaintiffs complained.

> Statutes of limitations are inflexible and unyielding. They operate inexorably without reference to the merits of plaintiff's cause of action. They are statutes of repose, intended to require that litigation be initiated within the prescribed time or not at all.
>
> The purpose of a statute of limitations is to afford security against stale demands, not to deprive anyone of his just rights by lapse of time. In some instances, it may operate

to bar the maintenance of meritorious causes of action. When confronted with such a cause, the urge is strong to write into the statute exceptions that do not appear therein. In such case, we must bear in mind Lord Campbell's caution: Hard cases must not make bad law.

*Congleton v. City of Asheboro*, 8 N.C. App. 571, 573-74, 174 S.E.2d 870, 872 (1970) (internal quotation marks and citations omitted).

¶ 75       Abuse of process is an intentional tort, and the tort of abuse of process has a three-year limitations period. *See Barnette v. Woody*, 242 N.C. 424, 431, 88 S.E.2d 223, 227 (1955) (citation omitted); *see also Cox v. Jefferson-Pilot*, 80 N.C. App. 122, 124, 341 S.E.2d 608, 610 (1986). "Ordinarily, the period of the statute of limitations begins to run when the plaintiff's right to maintain an action for the wrong alleged accrues." *Rafferty v. Wm. C. Vick Constr. Co.*, 291 N.C. 184, 184, 230 S.E.2d 405, 407 (1976) (internal quotation marks, citation, and emphasis omitted). "[A] cause of action accrues to an injured party so as to start the running of the statute of limitations when he is at liberty to sue . . . ." *Id.* at 182, 230 S.E.2d at 407 (citation omitted).

¶ 76       Plaintiffs, relying on secondary sources and *Barnette v. Woody*, argue the applicable limitations period commenced upon "the termination of the acts which constitute the abuse complained of." *See* 1 AM.JUR.2d, Abuse of Process, § 27 (1994); *see also* J.A. Brock, Annotation, When the Statute of Limitations Begins to Run Against Action for Abuse of Process, 1 A.L.R.3d 953 (2016). In *Barnette*, the plaintiff

alleged the defendant conspired "to procure the admission of the plaintiff to the State Hospital." 242 N.C. at 426, 88 S.E.2d at 224. The plaintiff was committed to the State Hospital on March 21, 1950 and was released on June 8, 1950. *Id.* The plaintiff brought a civil action seeking punitive and actual damages, but it was not clear "whether [the plaintiff] is seeking to recover on an action for malicious prosecution, abuse of process, or for false imprisonment." *Id.* at 430, 88 S.E.2d at 227. Our Supreme Court proceeded to apply a three-year statute of limitations from the date of the plaintiff's release from a state hospital. *Id.* at 431, 88 S.E.2d at 227 ("Hence, the three-year statute of limitations pleaded by the defendants, G.S. § 1-52, would not be a bar to an action for malicious prosecution or abuse of process.").

¶ 77 Plaintiffs contend *Barnette* supports the proposition that the applicable statute of limitations commenced when the claim for abuse of process accrued, that is, upon the last tortious act after process was instituted. We agree.

¶ 78 Defendants Johnson, Bellamy, and Hastings argue Plaintiffs' claim accrued upon their arrest on September 21, 2007, and thus, is time barred. Defendants Johnson, Bellamy, and Hastings rely on *Cox v. City of Jefferson-Pilot* to argue Plaintiffs' claim accrued upon their arrest date. In *Cox*, the dispositive issue was whether the plaintiff was mentally competent to enter into a general release of liability. *See Cox*, 80 N.C. App. at 124-25, 341 S.E.2d at 610. The plaintiff argued he was mentally incompetent at the time he executed a release of liability and, thus, the

statute of limitations was tolled during his incompetency. *Id.* The plaintiff's wife had previously been arrested for embezzling approximately $152,000.00 from her employer. *Id.* at 122, 341 S.E.2d at 609. The plaintiff was subsequently arrested and jailed for approximately two weeks. *Id.* After the plaintiff's arrest, his wife's employer and its insurance company filed a civil suit against the plaintiff and his wife, attaching the couple's property. *Id.* at 123, 341 S.E.2d at 609. The civil suit was settled by a consent judgment, signed by both the plaintiff and his wife. *Id.* Thereafter, on September 26, 1978, the plaintiff executed a release of liability in favor of the employer and insurance company. *Id.*

¶ 79        In 1983, the plaintiff filed a civil action in which he did not specify a cause of action but alleged his wife's employer and its insurance company wrongfully initiated his arrest and the seizure of his property. *Id.* The plaintiff further alleged he was mentally incompetent at the time he executed the release. *Id.* On appeal, he asserted he sufficiently pleaded an abuse of process claim. *Id.* at 124, 341 S.E.2d at 610. This Court found the plaintiff was mentally competent at the time he entered into a general release of liability. *Id.* at 126, 341 S.E.2d at 611. As such, the limitations period was not tolled, and Plaintiff's abuse of process cause of action was time barred. *Id.* at 128, 341 S.E.2d at 612.

¶ 80        Here, in contrast, Plaintiffs did not execute a release of liability in favor of any named defendant. Instead, Plaintiffs "pleaded continuing tortious acts after the

arrest date," the last of which concluded upon the dismissal of all remaining charges against Plaintiffs on February 23, 2009. These acts include Defendants Johnson, Bellamy, and Hastings's purported failure to provide exculpatory information during the course of the investigations and Sanders' criminal trial; and the continuous use of the pending criminal prosecution of Sanders and Fox "in an attempt to elicit information from Fox and Sanders," and force them out of the GPD. Thus, the statute of limitations for Plaintiffs' abuse of process cause of action did not run until February 23, 2012, three years after the termination of the last alleged act of abuse of process of which the Plaintiffs complained.

¶ 81     While our dissenting colleague proposes that we conclude the limitations period commenced upon the institution of the process, to do so would muddle the distinction between the claims of malicious prosecution and abuse of process and would ignore precedent establishing an improper act after the initiation of the process as an essential element of a colorable abuse of process claim. *See Chidnese*, 210 N.C. App. at 304, 708 S.E.2d at 731; *see also Fox v. Barrett*, 90 N.C. App. 135, 138, 367 S.E.2d 412, 414 (1988) (affirming the dismissal of an abuse of process cause of action where the plaintiff failed to allege "any improper act by defendant occurring *subsequent to* the initiation of the prior lawsuit." (emphasis in original)).

### 2. *Sufficiency of the Pleadings*

¶ 82     Plaintiffs further contend they sufficiently pleaded actions by Defendants

Johnson, Bellamy, and Hastings that arose to abuse of process.[10]  We agree.

> Protection against wrongful litigation is afforded by a
> cause of action for either abuse of process or malicious
> prosecution. The legal theories underlying the two actions
> parallel one another to a substantial degree, and often the
> facts of a case would support a claim under either theory.
> The distinction between an action for malicious
> prosecution and one for abuse of process is that malicious
> prosecution is based upon malice in causing the process to
> issue, while abuse of process lies for its improper use after
> it has been issued.

*Chidnese*, 210 N.C. App. at 304, 708 S.E.2d at 731 (citations and internal quotation

marks omitted).  "Abuse of process is the misuse of legal process for an ulterior

purpose. It consists in the malicious misuse or misapplication of that process . . . to

accomplish some purpose not warranted or commended by the writ." *Fowle v. Fowle*,

263 N.C. 724, 728, 140 S.E.2d 398, 401 (1965) (citations omitted); *see also Melton v.*

*Rickman*, 225 N.C. 700, 703, 36 S.E.2d 276, 278 (1945) ("[M]alicious prosecution is

the prosecution with malice and without probable cause, abuse of process is the

misuse of legal process for an ulterior purpose.").  Thus, the distinction between

malicious prosecution and abuse of process is that malicious prosecution requires a

claim to be improperly instituted, whereas abuse of process requires a wrongful or

---

[10] Defendants Johnson, Bellamy, and Hastings contend this argument is not preserved for appellate review, s*ee* N.C. R. App. P. 28(a), because Plaintiffs' "abuse of process argument in their principal appellants concerns **only** the statute of limitations." (emphasis in original).  However, in their appellate brief, Plaintiffs argue several alleged acts by Defendants Johnson, Bellamy, and Hastings constitute tortious acts for an abuse of process cause of action.

improper act after the institution of process. *Chidnese*, 210 N.C. App. at 304, 708 S.E.2d at 731 (citations omitted); *see also Fox*, 90 N.C. App. at 138, 367 S.E.2d at 414.

¶ 83 "Abuse of process requires both an ulterior motive and an [improper] act in the use of the legal process . . . [during] the regular prosecution of the proceeding, and that both . . . relate to . . . defendant's purpose to achieve . . . [using] the process some end foreign to those it was designed to effect." *Fuhs v. Fuhs*, 245 N.C. App. 367, 375, 782 S.E.2d 385, 390 (2016) (citation and emphasis omitted); *see also Klander v. West*, 205 N.C. 524, 529, 171 S.E.2d 782, 783 (1933) (recognizing "the two essential elements are the existence of an ulterior purpose and an act in the use of the process not proper in the regular prosecution of the proceeding"). The "ulterior motive" requirement for an abuse of process claim is satisfied "when the plaintiff alleges that the prior action was initiated by defendant or used by him to achieve a collateral purpose not within the normal scope of the process used." *Fuhs*, 245 N.C. App. at 375, 782 S.E.2d at 390 (citation omitted). "The act requirement is satisfied when the plaintiff alleges that *once the prior proceeding* was initiated, the defendant committed some willful act whereby he sought to use the existence of the proceeding to gain advantage of the plaintiff in respect to some collateral matter." *Id.* (emphasis added).

¶ 84 Defendants Johnson, Bellamy, and Hastings contend Plaintiffs' claim must fail as Plaintiffs did not plead any improper act by these Defendants after Plaintiffs' indictment. *See Fox*, 90 N.C. App. at 138, 367 S.E.2d at 414 (affirming the dismissal

of an abuse of process cause of action where the plaintiff failed to allege "any improper act by defendant occurring *subsequent to* the initiation of the prior lawsuit." (emphasis in original)); s*ee also Hewes v. Wolfe*, 74 N.C. App. 610, 610-13, 330 S.E.2d 16, 18-20 (1985) (affirming the denial of a motion to dismiss the plaintiff's abuse of process cause of action where defendant brought an earlier civil action for the misappropriation of partnership assets and subsequently filed a notice of *lis pendens* on the plaintiff's property). "[T]he gravamen of a cause of action for abuse of process is the improper use of the process *after it has been issued.*" *Chidnese*, 210 N.C. App. at 311, 708 S.E.2d at 735 (citation omitted) (emphasis in original).

¶ 85          In the instant case, Plaintiffs alleged

> 73. Defendants Johnson, Bellamy, . . . and Hastings, acting in their official capacities as duly assigned agents of the City of Greensboro, and the City of Greensboro willfully and maliciously took actions in the use of the legal process that were not proper in the regular prosecution of the proceeding by, *inter alia,*
>
> i. Using the threat of prosecution, and the proceeding itself, as leverage against Fox and Sanders in an attempt to elicit information from Fox and Sanders;
>
> ii. Using the threat of prosecution, and the proceeding itself, as leverage to pressure Fox and Sanders out of the [GPD]; and
>
> iii. Failing to produce exculpatory information with respect to the charges against Fox and Sanders despite defendants' affirmative duty to provide said information. Defendants were charged with an affirmative duty to provide said information due to:

> 1. The fiduciary relationship between the defendants and Fox and Sanders;
>
> 2. The defendants' involvement in the initiation of the investigation of Fox and Sanders; and
>
> 3. The defendant's involvement in the investigation of Fox and Sanders.
>
> 74. Defendants Johnson, Bellamy, . . . Hastings, and the City of Greensboro acted with an ulterior motive or purpose by taking the aforementioned actions for the purposes of discrediting former Chief of Police David Wray, advancing the defendants' own careers, and for the purpose of appeasing a segment of the African American community.

While Defendants Johnson, Bellamy, and Hastings are correct in that Plaintiffs must allege acts *after* the initiation of the proceeding, Plaintiffs satisfied this requirement by pleading Defendants Johnson, Bellamy, and Hastings failed to produce exculpatory information during the investigation of Plaintiffs and Sanders' subsequent criminal trial.[11]

¶ 86 Additionally, Plaintiffs asserted allegations that Defendants Johnson, Bellamy, and Hastings "acted with an ulterior motive" by failing to produce such information in order to gain "leverage to pressure Fox and Sanders out of the [GPD],"

---

[11] While the record on appeal reveals Defendant Hastings testified on Sanders's behalf during Sanders's trial for impermissibly accessing a government computer, we do not consider this fact in our analysis. Plaintiffs' abuse of process claim was dismissed on August 13, 2012. In reviewing the grant of a motion to dismiss, we consider "whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true." *Chidnese*, 210 N.C. App. at 304, 708 S.E.2d at 730 (emphasis added) (citation omitted).

and "in an attempt to elicit information from Fox and Sanders." These acts constitute continuous actions by Defendants Johnson, Bellamy, and Hastings, as the duty to provide exculpatory information arose during the investigation of the Wray administration and did not cease until Plaintiffs were no longer under the threat of criminal prosecution. Because Plaintiffs sufficiently alleged Defendants Johnson, Bellamy, and Hastings acted with an ulterior motive, we hold the trial court erred in dismissing Plaintiffs' abuse of process claim. *See Hewes v. Wolfe*, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985) (finding allegations the defendant acted "for the purpose of injuring and destroying the credit business of the plaintiffs and in general to oppress the plaintiffs[]" sufficient to survive a motion to dismiss). Accordingly, we reverse the trial court's order with respect to this cause of action, and remand for further proceedings.

### III.   Conclusion

¶ 87        After careful review, we hold the trial court did not err by dismissing Plaintiffs' civil conspiracy claim against all Defendants. Nor did the trial court err in granting summary judgment with respect to Plaintiffs' malicious prosecution claim against Defendants Johnson, Bellamy, and Hastings. However, the trial court erred in dismissing Plaintiffs' abuse of process cause of action, as the claim was not time barred and Plaintiffs sufficiently pleaded facts to support their claim. Accordingly, we affirm in part, reverse in part, and remand to the trial court for further

proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; REMANDED.

Judge ZACHARY concurs.

Judge JACKSON concurs in part and dissents in part by separate opinion.

JACKSON, Judge, concurring in part and dissenting in part.

¶ 88 I concur in part, joining the majority opinion except for the portion holding that the statute of limitations for Plaintiffs' abuse of process claim had not run until 23 February 2012. In my view, the allegations pleaded in the fourth count of Plaintiffs' complaint allege two separate abuse of process claims: (1) for the threat and initiation of criminal proceedings against Plaintiffs in September 2007; and (2) for alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963), in the trial of Plaintiff Sanders, while Plaintiff Fox was awaiting trial.

¶ 89 With respect to the first claim, I would hold that the statute of limitations had run on 17 September 2010—three years after Plaintiffs were indicted on these charges in Guilford County Superior Court. I would therefore affirm the trial court's grant of the motion to dismiss this claim because it was tolled until 20 September 2011, and Plaintiffs did not initiate this action until January 2012—well after September 2010, when the three-year statute of limitations had run, and several months after the September 2011 re-filing deadline, when the tolling period had expired.[12]

¶ 90 With respect to the second claim, however, I would hold that the allegations in

---

[12] On 23 March 2010, Plaintiffs filed a federal lawsuit asserting this claim. *Fox v. City of Greensboro*, 807 F. Supp.2d 476, 480 (M.D.N.C. 2011). Under 28 U.S.C. § 1367(d), it was tolled during the pendency of the federal case until 30 days after 27 August 2011, when the case was dismissed. *See* 28 U.S.C. § 1367(d) (2019) (providing for tolling of state law claims brought in federal court "while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"); *Fox*, 807 F. Supp.2d at 500-01 (dismissing Plaintiffs' state law claims without prejudice).

the complaint fail to demonstrate whether or when the claim for abuse of process because of the *Brady* violation accrued.  I would therefore vacate the trial court's order granting the motion to dismiss in part and remand the case to the trial court for further proceedings on this claim.  Accordingly, I respectfully dissent from the portion of the majority opinion related to the statute of limitations on Plaintiffs' abuse of process claim(s).

## IV.    Standard of Review

> The standard of review of an order granting a 12(b)(6) motion is whether the complaint states a claim for which relief can be granted under some legal theory when the complaint is liberally construed and all the allegations included therein are taken as true.  On a motion to dismiss, the complaint's material factual allegations are taken as true.  Dismissal is proper when one of the following three conditions is satisfied:  (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.  On appeal of a 12(b)(6) motion to dismiss, this Court conducts a *de novo* review of the pleadings to determine their legal sufficiency and to determine whether the trial court's ruling on the motion to dismiss was correct.

*Burgin v. Owen*, 181 N.C. App. 511, 512, 640 S.E.2d 427, 428-29 (2007) (internal marks and citations omitted).

## V.    Analysis

### D. Abuse of Process Compared to Malicious Prosecution

¶ 91        "The distinction between an action for malicious prosecution and one for abuse

of process is that malicious prosecution is based upon malice in causing [] process to issue, while abuse of process lies for its improper use after it has been issued." *Barnette v. Woody*, 242 N.C. 424, 431, 88 S.E.2d 223, 227 (1955). Whereas "[i]n an action for malicious prosecution the plaintiff must prove malice, want of probable cause and termination of the prosecution or proceeding in plaintiff's favor[,] . . . the only essential elements of abuse of process are[] . . . the existence of an ulterior purpose and . . . an act in the use of the process not proper in the regular prosecution of the proceeding." *Id.*, 88 S.E.2d at 227-28 (citations omitted). Thus, while a claim of malicious prosecution requires a showing that "the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff[,]" *Turner v. Thomas*, 369 N.C. 419, 425, 794 S.E.2d 439, 444 (2016) (citation omitted), in an action for abuse of process, the plaintiff need only show "(1) that the defendant had an ulterior motive to achieve a collateral purpose not within the normal scope of the process used, and (2) that the defendant committed some act that is a malicious misuse or misapplication of that process after issuance to accomplish some purpose not warranted or commanded by the writ[,]" *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 602, 646 S.E.2d 826, 831 (2007) (internal marks and citation omitted). Accordingly, unlike an action for malicious prosecution, which can only be brought after a prior proceeding terminates in the plaintiff's favor, *Turner*, 369 N.C. at 425,

794 S.E.2d at 444, an action for abuse of process can be commenced as soon as the process at issue is filed or interposed, *see e.g.*, *Hewes v. Wolfe*, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985) (holding that assertion of a claim for abuse of process was proper once the defendants "filed notices of *lis pendens* and notices of lien on property owned by [the] plaintiffs").

**E. When the Statute of Limitations Begins to Run**

¶ 92        Generally speaking, "a cause of action accrues [] and the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." *Penley v. Penley*, 314 N.C. 1, 20, 332 S.E.2d 51, 62 (1985) (citations omitted). Application of this general rule to a claim for abuse of process suggests that the statute of limitations for abuse of process begins to run as soon as the plaintiff's cause of action accrues, i.e., upon the filing or interposition of the allegedly abusive process. *Cf. Hewes*, 74 N.C. App. at 614, 330 S.E.2d at 19. Yet the question of when the three-year statute of limitations begins to run appears unsettled under North Carolina law, as the parties' divergent positions and the authority cited in support of these positions illustrates.

¶ 93        Plaintiffs cite our Supreme Court's decision in *Barnette v. Woody*, 242 N.C. 424, 88 S.E.2d 223 (1955), in support of their argument that the statute of limitations began to run "from the termination of the acts which constitute[d] the abuse complained of." (Citation omitted.) The plaintiff in *Barnette* was involuntarily

committed to a mental institution for 76 days and subsequently brought an action for abuse of process against various individuals involved in her involuntary commitment. *Id.* at 426-31, 88 S.E.2d at 224-27.  The defendants pleaded the three-year statute of limitations in defense because the process at issue was filed with the Clerk of Superior Court of Person County on 21 March 1950 and the plaintiff did not initiate the action until 26 May 1953—three years, two months, and five days after the process was filed.  *See id.* at 428, 431, 88 S.E.2d at 225, 227.  Our Supreme Court rejected the argument that the plaintiff's claim was time-barred because it was filed more than three years after the date the process was filed with the Clerk of Superior Court, seeming to reason that the statute of limitations began to run upon the plaintiff's release, or on some other day after 21 March 1950.  *Id.* at 431, 88 S.E.2d at 227.

¶ 94          Defendants cite our Court's decision in *Cox v. Jefferson-Pilot*, 80 N.C. App. 122, 341 S.E.2d 608 (1986), in support of their argument that the statute of limitations began to run on the date of Plaintiffs' arrests.  In *Cox*, the plaintiff was interrogated, arrested, and jailed for 14 days after his wife was charged with embezzling funds from her employer.  *Id.* at 122, 341 S.E.2d at 609.  After the charges against him were dismissed, the plaintiff brought an action against his wife's employer for abuse of process.  *Id.* at 123, 341 S.E.2d at 609-10.  Our Court held that the statute of limitations for the plaintiff's claim began to run on the day the plaintiff was arrested

and charged in connection with his wife's embezzlement. *See id.* at 122-24, 341 S.E.2d at 609-10. Thus, while consistent with the general rule that statutes of limitation begin to run when the underlying cause of action accrues, our holding in *Cox* appears to conflict with our Supreme Court's decision in *Barnette*.

¶ 95     I believe that the comments to the Second Restatement of Torts suggest a resolution of this apparent conflict. *See* Restatement 2d of Torts § 682 cmt. a. These comments state that "[t]he gravamen of the misconduct [in an action for abuse of process] . . . is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish." *Id.* That is, "subsequent misuse of [] process, [] properly obtained, constitutes the misconduct for which [] liability is imposed[.]" *Id.* Accordingly, I interpret our Supreme Court's decision in *Barnette* to describe a situation where process was properly filed, but the process was subsequently abused, despite being filed for a proper purpose at the outset. The recitation of the facts that precedes the Court's opinion in *Barnette* supports this interpretation, in my view: in the facts, it is noted that the Clerk of Superior Court of Person County had initially ordered the plaintiff to be involuntarily committed for 30 days, and subsequently ordered that she continue to be committed for an additional 30 days; our Supreme Court also stated, however, that the plaintiff was not released until after being confined in the mental institution for 76 days—16 days longer than ordered. *See* 242 N.C. at 428, 431, 88 S.E.2d at 225-26, 227.

¶ 96        I would therefore hold that the three-year statute of limitations for abuse of process begins to run at the time the cause of action accrues, which is as soon as the process is improperly filed or interposed, *see Hewes*, 74 N.C. App. at 614, 330 S.E.2d at 19, or when process properly filed or interposed becomes misused subsequently, as I believe happened in *Barnette*.

**F.  Abuse of Process Alleged in Plaintiffs' Complaint**

¶ 97        As noted above, I believe the allegations pleaded in the fourth count of Plaintiffs' complaint allege two separate claims for abuse of process:  (1) for the threat and initiation of criminal proceedings against Plaintiffs in September 2007; and (2) for alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963), in the trial of Plaintiff Sanders, while Plaintiff Fox was awaiting trial.  Plaintiffs alleged in the fourth count of their complaint in relevant part as follows:

> 73.     Defendants Johnson, Bellamy, Kelly and Hastings, acting in their official capacities as duly assigned agents of the City of Greensboro, and the City of Greensboro willfully and maliciously took actions in the use of legal process that were not proper in the regular prosecution of the proceeding by, *inter alia*,
>
>      i.  Using the threat of prosecution, and the proceeding itself, as leverage against Fox and Sanders in an attempt to elicit information from Fox and Sanders;
>
>      ii.  Using the threat of prosecution, and the proceeding itself, as leverage to pressure Fox and Sanders out of the Greensboro Police Department; and
>
>      iii. Failing to produce exculpatory information with

respect to the charges against Fox and Sanders despite defendants' affirmative duty to provide said information. Defendants were charged with an affirmative duty to provide said information due to:

> 1. The fiduciary relationship between the defendants and Fox and Sanders;
>
> 2. The defendants' involvement in the initiation of the investigation of Fox and Sanders; and
>
> 3. The defendants' involvement in the investigation of Fox and Sanders.

¶ 98     Regarding the first claim—the actions alleged in subsections i. and ii. of paragraph 73 of Plaintiffs' complaint—I would hold that the statute of limitations had run on 17 September 2010, three years after Plaintiffs were indicted on the charges in Guilford County Superior Court. Assuming the truth of the allegations in the complaint, as we must when reviewing a motion to dismiss, *Burgin*, 181 N.C. App. at 512, 640 S.E.2d at 428-29, I believe Plaintiffs' cause of action for abuse of process stemming from the charges in September 2007 accrued on the date they were indicted—17 September 2007—because as I understand it, this claim is that the indictment itself was legal process improperly filed in Guilford County Superior Court with an ulterior motive. Accordingly, I would affirm the trial court's grant of the motion to dismiss on this claim because Plaintiffs did not initiate this action until January 2012, several months after the expiration of the 30-day deadline to re-file

the claim after the federal lawsuit was dismissed without prejudice to state-law claims on 27 August 2011.

¶ 99        Regarding the second claim—the actions alleged in subsection iii. of paragraph 73 of Plaintiffs' complaint—I would hold that the allegations in the complaint fail to demonstrate whether or when the claim for abuse of process because of the *Brady* violation accrued.  The allegations in subsection iii. of paragraph 73 do not specify when the alleged failure to produce exculpatory information occurred, and it appears that this alleged failure to produce exculpatory information could have occurred within the three-year statute of limitations, and it might be likely that it did.  I would therefore vacate the trial court's order granting the motion to dismiss in part and remand the case to the trial court for further proceedings on this claim.

## VI.    Conclusion

¶ 100        In sum, I concur in the majority opinion in part, and dissent from it in part, because the allegations in the complaint allege two separate abuse of process claims, and I would hold that the statute of limitations has run on one, but it is impossible to tell whether it has on the other.